Argued and submitted December 13, 1993, reversed and remanded with instructions
January 19, petition for review denied March 22, 1994 (318 Or 478)

Eric LANGFORD,
Ty Huling and Milo Dudden,
*Respondents,*

*v.*

CITY OF EUGENE
and Lane County Housing Authority
and Community Services Agency,
*Petitioners.*

(LUBA 93-090; CA A81712)

867 P2d 535

Glenn Klein argued the cause for petitioners. With him on the brief were Stephen L. Vorhes, and Harrang Long Watkinson Laird & Rubenstein, P.C.

Douglas M. DuPriest argued the cause for respondents. With him on the brief was Hutchinson, Anderson, Cox, Parrish & Coons, P.C.

Before Deits, Presiding Judge, and Riggs, Judge, and Durham, Judge pro tempore.

DEITS, P. J.

**DEITS, P. J.**

The City of Eugene (city) and Lane County Housing Authority and Community Services Agency (HACSA) seek review of LUBA's decision remanding the city's approval of HACSA's application for a conditional use permit to construct a "controlled income and rent" (CIR) low income housing project.[1] LUBA concluded that the city erred in three respects: its findings relating to the adequacy of the emergency response system that would serve the project were conclusory and insufficient; its findings that school facilities would be adequate to meet anticipated demand were not supported by substantial evidence; and the city misinterpreted its zoning legislation as allowing the application to be approved on the basis of its code's CIR provisions alone, rather than also applying the planned unit development (PUD) provisions in the code. Petitioners challenge each of LUBA's adverse rulings. We agree with LUBA's conclusions on the first two issues, and no discussion of them is necessary. However, we disagree with LUBA's conclusion that the city's interpretation of its code is reversibly wrong.

HACSA's application proposed a 25 multi-family dwelling unit development on one undivided lot. The city concluded that section 9.724 of the Eugene Code (EC),[2] which pertains to CIRs, contained the applicable approval criteria, and that the PUD provisions in sections 9.508 *et seq*, were not applicable to the proposal. Respondents argued to the city that section 9.724 governs density issues, but does not address certain other matters that are covered by the PUD provisions. Therefore, respondents concluded that the PUD provisions, as well as the CIR provisions, had to be applied in order to obtain approval relating to those other matters — specifically, whether to allow development to take place on a single lot and to allow the development to consist entirely of multi-family units rather than containing a majority of lots dedicated to single family occupancy.

The city disagreed with that argument. It found, as quoted in LUBA's opinion:

"It is contended that the C.I.R. process addresses the issue of density but does not authorize the project's proposed

---

[1] The city and HACSA have appeared jointly. Where differentiation is not necessary, we will refer to them collectively as "petitioners."

[2] A copy of that section is appended to this opinion.

single lot aspect and the development of an exclusively multi-family housing project. Section 9.384 of the Eugene Code contains the listing, in matrix form, of allowable uses in the residential districts. Under the general category of 'dwellings,' the use 'Controlled income and rent with increased density' is listed, similarly to other uses listed in this matrix. That listing indicates that this use can be located by conditional use permit in the RA and R-1 districts. The listing states that 'Standard 13' is applicable. The cited Standard 13 merely states that this use 'must conform to the standards and procedures in Section 9.724.'

"Section 9.724 is entitled and deals exclusively with 'Conditional Use Permits for Controlled Income and Rent Housing.' The last sentence of Subsection (1) of E.C. 9.724 states:

" 'A conditional use permit for CIR housing is not necessary unless the increased density provided for in Section 9.724 is required.'

"It is argued by those opposed to the project that, based upon this language, the C.I.R. process is only one to allow an increase in density and where, as here, the project could be developed without an increase in density if it was not for the wish to develop on a single parcel multiple family dwellings, the proposal should be subject to * * * review [under] the planned unit development process.

"[The city's] construction of the ordinance is that a controlled income and rent housing project is articulated as a use in the Eugene Code and is not merely a means to provide increased density. [T]he last sentence of E.C. 9.724(1), above quoted [means] that controlled income and rent housing, as that use is defined at E.C. 9.015, could be developed pursuant to planned unit development procedures if it would comply with the maximum density per gross acre allowed under E.C. 9.510(6)(a). The intent of the last sentence of E.C. 9.724(1) was to make it clear that a planned unit development that involved controlled income and rent housing was not going to be subject to the criteria and review of E.C. 9.724 unless an increase in density over that allowed by the planned unit development provisions was sought. [T]he language of EC 9.724 clearly indicates that only the criteria of that section are applicable."

LUBA rejected the city's interpretation, concluding that it was inconsistent with the express language of the local legislation and, therefore, was not affirmable under *Clark v.*

*Jackson County*, 313 Or 508, 836 P2d 710 (1992), and our cases that implement *Clark*. LUBA reasoned, *inter alia*:

"On its face, the CIR provisions set out in EC 9.724 are, as petitioners argue, simply a density increasing provision for CIR housing, whatever form that housing may take — single family or multi-family. There is nothing in the wording or context of EC 9.724 permitting deviations from the requirements that otherwise apply under the applicable zoning district. If, for example, code provisions made it clear that CIR housing necessarily includes exclusively multi-family housing or necessarily includes more multi-family housing than allowed under limitations imposed by the underlying zoning, we might agree that approval of increased density CIR housing under EC 9.724 would include approval of that aspect of the disputed project without PUD approval. Similarly, if the increased density CIR approval provisions contained language that either suggested such housing necessarily would be constructed on single parcels, without the need to subdivide or seek PUD approval, or suggested that additional approvals to deviate from the limits on developing single parcels that otherwise apply under the R-1 zone need not be obtained, we might agree with the city's interpretation. No such language exists in EC 9.724.

"The city's reference to the fact CIR housing is listed in the matrix at EC 9.384 makes it clear that CIR housing *with increased density* is allowed in the R-1 zone, but says *nothing* about whether such increased density CIR housing must comply with other requirements of the CIR zone, or obtain any appropriate approvals necessary to deviate from those requirements. In this regard the definition of CIR housing is important. EC 9.015 defines CIR housing as follows:

" 'A housing project sponsored by a public agency, a non-profit housing sponsor * * * to undertake, construct, or operate a controlled income and rent housing project.'

"This definition says nothing about how much multi-family housing will be included in a CIR project or whether such a housing project will be developed on a single parcel or as part of a subdivision.

"In short, we agree with petitioners that there is nothing in the EC provisions cited by the parties that suggests the CIR increased density approval process set out in EC 9.724 may authorize anything other than a CIR housing project with increased density. All other zoning limitations continue

to apply, unless appropriate approvals are granted to deviate from those limitations." (Emphasis in original.)

We disagree with LUBA's analysis and with its conclusion. We have held that the inquiry under *Clark* is whether the local interpretation is "clearly wrong," and that LUBA's task is not to provide an independent interpretation of local land use legislation that might appear preferable to the local government's, but to evaluate the local government's interpretation to determine whether it is sustainable under the *Clark* tests. *See, e.g., Goose Hollow Foothills League v. City of Portland,* 117 Or App 211, 843 P2d 992 (1992); *Reusser v. Washington County,* 122 Or App 33, 857 P2d 182, *rev den* 318 Or 60 (1993). We have also indicated that, where the local interpretation consists of a decision about which of two or more arguably applicable approval criteria in its legislation applies to a particular use, the local interpretation will seldom be reversible under the *Clark* standard. *Dept. of Land Conservation v. Crook County,* 124 Or App 8, 860 P2d 907 (1993); *Friends of the Metolius v. Jefferson County,* 123 Or App 256, 860 P2d 278, *on recon* 125 Or App 122, 866 P2d 463 (1993).

■ The question under *Clark* that is pertinent here is whether the local interpretation "is inconsistent with express language" of the local legislation. 313 Or at 515. The city interpreted section 9.724 as applying comprehensively and exclusively to CIRs as a *use,* and not only to the *issues of density in conjunction with that use* that are among the matters that the section mentions. LUBA's reasoning was not responsive to that interpretation; rather, it developed its own interpretation with the central premise that, because section 9.724 deals expressly with density but does not mention any requirements for subdivision and parcelization or the mix of single and multi-family dwellings, other code provisions that do deal with the latter issues in certain other contexts are necessarily applicable to the approval of the proposed CIR project. LUBA further explained that, although the city's interpretation might be consistent with the policy of section 9.724, its arguments that the section was meant to contain the exclusive standards for CIR approvals "do not provide a basis for reading [exclusivity] language into EC 9.724 that is simply not there."

■ LUBA's reasoning changes the question from whether the city's interpretation is *inconsistent* with the

express language of the legislation to whether there is language in the legislation that *expressly says* what the city interpreted the legislation to mean. That is not the question that *Clark* asks and, if it were, it would be a *non sequitur*: there would be no need for interpretation if anything that is *not* expressly said in the legislation is to be deemed inconsistent with its express language.

■ We conclude that the city's interpretation is not inconsistent with the language of the ordinance. As in *Friends of the Metolius v. Jefferson County, supra,* and *Dept. of Land Conservation v. Crook County, supra,* the interpretation embodies a conclusion that some local provisions are applicable to the decision and others are not, when the language of the provisions, separately or in combination, can reasonably be read either way.[3] If section 9.724 is the exclusive provision governing CIR proposals, there would be no inconsistency with its language or the language of the PUD provisions for the latter to be inapplicable to those proposals, even though they contain some approval criteria that section 9.724 does not. The city read the CIR provisions as governing a use rather than the particular incident of that use — density — on which LUBA focused. Section 9.724 discusses many matters other than density, ranging from underlying policy concerns to specific approval criteria. The language of the section allows the city's conclusion that it comprehensively regulates the approval or disapproval of CIR projects as a use, and not just one of the several features of the use that are expressly discussed in the section.

Reversed and remanded with instructions to modify remand to city in accordance with this opinion.

---

[3] We noted in *Crook County,* 124 Or App at 14 n 4, and also note here, that no issues concerning Oregon Laws 1993, chapter 792, are presented.

# APPENDIX

## Eugene Code

**9.724** *Conditional Use Permits for Controlled Income and Rent Housing.*

(1) *Purpose.* This classification of conditional use is provided in order to encourage the construction of more housing for families and individuals who cannot get decent, safe, and sanitary shelter in the open market for 25 percent of gross family income. The need to make special provision for low and moderate income housing has been recognized by the city in the following policy documents:

(a) *Eugene's Community Goals and Policies* states that the city should be receptive to specialized housing needs and adopt zoning in recognition of those needs.

(b) *The City's Housing Policy Resolution* reaffirms the city's concern for the provision and dispersal of low and moderate income housing and states that: "The city should continue to cooperate with sponsors of local, state or federally subsidized housing as provided by ORS 456.355 to 456.370 inclusive, which allows cities and counties to subsidize land and public improvements to assist sponsors in meeting housing needs."

(c) *The Metropolitan Area General Plan* includes a specific finding relative to the problem of maintaining an adequate supply of housing for low and moderate-income households, an objective calling for encouragement and support of housing for low-moderate income households, and policies calling for regulations that encourage a variety of housing densities and types as well as participation by a full range of public and private organizations in the low and moderate-income groups.

In order to achieve the housing goals of the city concerning the provision and dispersal of low and moderate-income housing, it is necessary to establish zoning procedures that will implement those policies by allowing an increase in

density is necessitated by local land costs and the fact that the high cost of land precludes the use of most land already zoned to higher density for the development of lower income housing.

Since the Metropolitan Area General Plan authorizes local jurisdictions to establish specific density ranges and establishes the provisions of low and moderate-income housing as a metropolitan objective, the provisions of the Eugene Code, 1971, dealing with controlled income and rent housing are deemed to be a method for correlating the *General Plan* goals with local conditions. Further, the criteria for controlled income and rent housing established in section 9.724(2) and (3) will insure that the objective of the *General Plan* in maintaining a balance between the level of development and the provision of services is achieved.

A conditional use permit for CIR housing is not necessary unless the increased density provided for in section 9.724 is required.

(2) *Allowance of increased density.* In accordance with the intent of ORS 456.364 *Powers of City or County in Aiding or Cooperating on Housing Projects*, the hearings official may increase the density allowed in the RA and R-1 zoning district to 75 percent of the allowable density for an R-2 PD. The increased density is not automatic, and may be reduced from this maximum if the hearings official finds that the size of the units or nature of the occupants (elderly vs. family) could place exceptional demands on public facilities thereby necessitating such a reduction in density.

(3) *Criteria for hearings official approval.* Applications for conditional use permits for controlled income and rent housing shall be processed and scheduled for public hearings in the same manner as other conditional use permit applications, except the following shall substitute for the required criteria listed in section 9.702:

(a) Public and private facilities are adequate to meet anticipated demand. These include, but are not limited to, local streets, schools, parks, and shopping.

(b) The proposed project is designed to:

1. Avoid unnecessary removal of attractive natural vegetation.

2. Provide setbacks or screening as necessary when possible and practical to ensure privacy to adjacent outdoor living areas.

3. Incorporate building materials, colors, and textures that are compatible with existing structures in the immediate area.

4. Provide safe and usable parking, circulation, and outdoor living areas as well as ingress and egress.

(c) The location conforms to the principles of dispersal as encompassed in the city's Housing Dispersal Policy Plan.

(4) *Financing compliance.* The project must comply with criteria stipulated by affected local, state, and federal financing agencies, including, but not limited to, rent and income limitations.

(5) *Parking and outdoor living requirements.* Outdoor living and parking requirements may be adjusted by the hearings official to fit demonstrated demand in similar projects with appropriate safeguards for possible changes in occupancy.

(6) *Contract.* The conditions and design requirements established by the hearings official for each controlled income and rent housing development shall be incorporated in a contract between the city and the sponsor.

(7) *Appeals.* The applicant, or any interested party, may appeal the decision of the hearings official in the same manner as appeals from actions of the hearings official for other conditional use permits.