Argued and submitted April 24, motion to strike denied; affirmed May 29, petition for review denied October 22, 1996 (324 Or 322)

James J. HUNTZICKER,
Patricia M. Huntzicker and Bethany Neighbors,
*Petitioners,*

*v.*

WASHINGTON COUNTY
and Central Bethany Development Company,
*Respondents.*

(LUBA Nos. 94-160, 94-181; CA A92180)

917 P2d 1051

Jeffrey L. Kleinman argued the cause and filed the brief for petitioners.

David C. Noren, Assistant County Counsel, argued the cause for respondent Washington County. With him on the brief was Dan R. Olsen, Interim Washington County Counsel.

Jeff H. Bachrach argued the cause for respondent Central Bethany Development Company. With him on the brief was O'Donnell Ramis Crew Corrigan & Bachrach.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DEITS, P. J.

## DEITS, P. J.

Petitioners seek review of LUBA's affirmance of the Washington County governing body's approval of respondent Central Bethany Development Company's (respondent) application for a planned development. We affirm.

We take the facts, in part, from LUBA's opinion:

"On or about December 31, 1992, [respondent] filed an application for approval of the 'Bethany Planned Development Master Plan' (master plan) on 92 acres. The subject property is in the area governed by the Bethany Community Plan (BCP), which encompasses three square miles of the unincorporated portion of northeast Washington County. The property includes land within three multi-family zoning districts, R-9, R-15 and R-24, and also includes a 15-acre commercial business district. Some of the property is within an 'area of special concern,' as the term is used in the BCP. The surrounding properties are either developed as or undeveloped and zoned for single-family residential use.

"\* \* \* \* \*

"The master plan approves a 15-acre commercial center. It also approves possible day care and professional office uses in certain residential areas. If fully developed under the residential zoning in place prior to adoption of the master plan, the subject property would allow a maximum of 1,060 dwelling units. The master plan allows a maximum of 860 dwelling units." (Footnote omitted.)

The BCP is a "community plan" and a component of the county's comprehensive plan. The county's land use regulations are contained in the Community Development Code (CDC). Section 404 of the CDC applies to planned development "master planning" of the kind in question. Section 404-4.5(G), one of those applicable provisions, states that "[t]he land use districts,[1] as designated by the Community Plan for

---

[1] We understand "land use districts" to be synonymous with "zones" or "zoning designations."

the subject site, may float within the boundaries of the proposed planned development." The area of respondent's project contains a number of land use districts, including residential zones of three different densities, that are placed and shown at specific locations by the BCP and the BCP map. However, the county interpreted section 404-4.5(G) as permitting the districts and densities to be redistributed throughout the territory of the planned development, *inter alia*, "as long as the total number of [dwelling] units does not exceed the maximum allowed by the underlying zoning districts."

The net effect was fairly, if somewhat graphically, captured in LUBA's description of petitioners' argument:

> "Petitioners point out that the master plan map not only shifts the location of the Central Business District (CBD) from the central location shown on the BCP map, but also alters the location and size of residential districts formerly zoned R-9, R-15 and R-24, expanding the areas allowing higher densities at the expense of those requiring lower densities." (Footnote omitted.)

Petitioners contended to LUBA and in their first assignment of error to us that the county's interpretation of the BCP and CDC provisions effects "radical changes to land use designations and densities" in the BCP, is wrong and is not entitled to deference under *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992), or the parts of ORS 197.829(1) that codify *Clark*. LUBA disagreed, concluding that the interpretation was not "clearly wrong," and therefore was not reversible. *Goose Hollow Foothills League v. City of Portland*, 117 Or App 211, 217, 843 P2d 992 (1992).

Although we agree with LUBA's conclusion, some comment is necessary about the manner in which LUBA reached it. LUBA first noted, correctly, that its task under ORS 197.829, *Clark* and later related cases was to determine whether the *county's interpretation* of the local provisions was clearly wrong. Nevertheless, LUBA first proceeded to render its own interpretation of section 404-4.5(G), by applying the method of statutory construction set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). LUBA explained that, "[i]f the county's interpretation

survives review" under the general rules of statutory construction, "it necessarily passes the *Clark* test."

For a number of reasons, we discourage the approach that LUBA followed. First, it superimposes a second intervening question that differs from the one that *Clark* asks directly. As we explained in *Goose Hollow*, "the question under *Clark* * * * is not whether the [local body] was 'right' but whether it was clearly wrong." 117 Or App at 217. "Right" refers to what the reviewing body itself would interpret the provision to mean; "clearly wrong" contemplates the question of whether the reviewing body can say that no person could reasonably interpret the provision in the manner that the local body did. The rules of statutory construction, as explained in *PGE*, are designed to arrive at a "right" understanding of the meaning of an enactment. Although it might be abstractly correct that, if an interpretation is right, it cannot be clearly wrong, the converse is by no means true: LUBA's and our post-*Clark* cases amply illustrate that there are many points on the continuum between "right" and "clearly wrong."

Moreover, we have repeatedly emphasized that, since *Clark*, LUBA's responsibility in cases to which *Clark* and ORS 197.829(1)(a)-(c) apply is to review the local interpretation, and "not to provide an independent interpretation of local land use legislation." *Langford v. City of Eugene*, 126 Or App 52, 57, 867 P2d 535, *rev den* 318 Or 478 (1994); *see also, e.g., Zippel v. Josephine County*, 128 Or App 458, 461, 876 P2d 854, *rev den* 320 Or 272 (1994).

If the problem were simply one of LUBA making extra work for itself by answering two questions instead of one, we would be hesitant to interfere. However, we think that LUBA's approach here could also result in unnecessary work for us and, more saliently, could skew the process of review. We review LUBA's opinions with the great respect that its members have garnered over the years. However, that does not mean that we always agree with it. The risk that we think inheres in LUBA's approach is that it provides two grounds instead of one on which we must evaluate the correctness of LUBA's analysis and the merits of particular

cases. For example, if LUBA concluded that a local interpretation was not reversible under *Clark*, without more, because it accorded with the interpretation of the local provision that LUBA reached on its own under *PGE*, we might not agree with *LUBA's* interpretation; the *Clark* question would nevertheless remain, and LUBA would have provided no independent answer to or guidance on it.

For the foregoing reasons, we will review this case pursuant to *Clark* and its statutory and judicial progeny, and we now return to the specifics of the case. Although the county applied and relied primarily on section 404-4.5(G) itself, it also considered other BCP and CDC provisions in arriving at its interpretation. Two of those provisions warrant mention. Subarea Design Element 6 of the BCP provides, in part:

> "Locational adjustments to the development designations within the Area of Special Concern Boundary may be approved during the Master Planning-Planned Development Process."

"Planned Development" is defined in CDC section 106-161 as:

> "An integrated, coordinated development of land, normally involving *increased flexibility in use* and design standards, with special incentive or restrictions on development." (Emphasis supplied.)

Petitioners argue that the county failed to apply section 300-3 of the CDC, which pertains to density transfers under some circumstances. Petitioners maintain:

> "The key distinction that the county failed to make between CDC 404-4.5(G), upon which it did rely in the challenged decision, and CDC 300-3, upon which it did not rely, is that while *land use districts* are expressly permitted to float under the former, *densities* are not addressed at all." (Emphasis petitioners'.)

■ The distinction petitioners make does not appear to be a meaningful one. Densities are often *part* of a land use district or zoning designation and, here, the main if not only thing that distinguishes the three residential classifications in the area is their permissible densities. Moreover, the

county's order specifically mentioned section 300-3, and described it as an "alternative" to the provision—section 404-4.5(G)—that the county found to be applicable. We have noted on a number of occasions that,

> "where the local interpretation consists of a decision about which of two or more arguably applicable approval criteria in its legislation applies to a particular use, the local interpretation will seldom be reversible under the *Clark* standard." *Langford*, 126 Or App at 57, and cases there cited.

Petitioners also assert:

> "[Section 404-4.5(G)] allows entire districts to float under certain circumstances. However, it says nothing about the transfer of densities and expansion of certain uses, changing not only location of land use districts, but their *size* as well." (Emphasis petitioners'.)

Again, however, the densities are integral to the definition of the districts and, in the case of the residential districts here, they virtually *are* the definition. Although petitioners' interpretation is a plausible one, it does not demonstrate that the county's is implausible, let alone clearly wrong; the language of section 404-4.5(G) does not preclude the county's understanding that "float within" can mean "distribute or allocate within," rather than contemplating only the lock, stock and barrel movement of entire districts to which petitioners would limit the provision.

■     Beyond their specific contentions, petitioners' overriding theme is:

> "Under the county's interpretation, CDC 404-4.5(G) permits any developer who does not exceed the total combined densities of the land use districts on a site, to make *de facto* changes in the county's planning and zoning designations under the guise of 'planned development,' without formally seeking their amendment. This interpretation serves to destroy both the concept of land use districts, and the role of formally adopted comprehensive plans." (Footnote omitted.)

There may well be merit to petitioners' point that the county's interpretation is inconsistent with the traditional role of comprehensive plans and planning in Oregon. Nonetheless, petitioners have not shown that the county's interpretation of

*this* comprehensive plan and land use regulation, which have been acknowledged, is clearly wrong, or is reversible under ORS 197.829 and *Clark*.[2]

Petitioners make three other assignments, none of which requires discussion. Respondent moves to strike three pages of petitioners' brief. The motion is denied.

Motion to strike denied; affirmed.

---

[2] We note, as did LUBA, that the concept of "floating zones" has gained some recognition in zoning law. *See* 2 Robert M. Anderson, *American Law of Zoning*, § 11.06 (3d rev ed 1986). The parties do not agree about the appropriate uses of floating zones in the planning process. That question is not before us in this case.