Paul VISHER,
*Petitioner,*

*v.*

## CITY OF CANNON BEACH,
Breakers Point Homeowners Assn.,
Mark Borquist, Bruce Francis and Mel Shulevitz,
*Respondents.*

(98-030; CA A103495)

973 P2d 372

Dean N. Alterman argued the cause for respondents Breakers Point Homeowners Assn., Mark Borquist, Bruce Francis and Mel Shulevitz. With him on the brief were Mary Ellen Page Farr and Kell, Alterman & Runstein, L.L.P.

William R. Canessa and Campbell, Moberg, Canessa, Faber & Hooley, P.C., waived appearance for respondent City of Cannon Beach.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

DEITS, C. J.

**DEITS, C. J.**

Petitioner appealed to LUBA from the Cannon Beach City Council's decision granting respondent Breakers Point Homeowners Assn. and the individual respondents a conditional use permit to remove and relocate 2,000 cubic yards of sand from a dune near respondents' condominiums. Although LUBA remanded the decision on a different ground, it rejected petitioner's argument that the city's interpretation of section 17.38.210.G of its zoning ordinance was "clearly wrong" and that the provision lent itself only to a more restrictive construction that was inconsistent with the allowance of the sand removal. Petitioner seeks judicial review and assigns error to LUBA's ruling on that issue. We affirm.

Section 17.38.210 provides, in material part:

"Coastal high-hazard areas (V zones) are located within the areas of special flood hazard established in Section 17.38.040. These areas have special flood hazards associated with high velocity waters from tidal surges and, therefore, in addition to meeting all provisions in this chapter, the following provisions also apply:

"* * * * *

"G. Manmade alteration of sand dunes which would increase potential flood damage is prohibited."

The city interpreted subsection G to prohibit only those alterations that would increase the potential damage from "base flood" levels. Under Section 17.38.030 of the ordinance, "base flood" (sometimes called the "100-year flood")

"means the flood having a one percent chance of being equalled [*sic*] or exceeded in any given year."

The term "flood" is defined in the same section as meaning

"a general and temporary condition of partial or complete inundation of normally dry land areas from:

"1. The overflow of inland or tidal waters; and/or

"2. The unusual and rapid accumulation of runoff of surface waters from any source."

Petitioner argued to the city, as he has in turn to LUBA and to us, that the terms "flood" and "base flood" are both defined in the ordinance; that subsection G expressly uses the term "flood"; and that it therefore cannot correctly be interpreted as prohibiting only those alterations that would increase the potential for damage from the particular subset of flooding that meets the ordinance definition of "base flood."

The city council rejected petitioner's argument and explained its interpretation, *inter alia*:

> "Section 17.38.210.G states that the 'manmade alteration of sand dunes which would increase potential flood damage is prohibited.' In interpreting this criterion, a determination must be made as to the standard that will be used to assess what constitutes an increase in potential flood damage. We have determined that that standard is a potential increase in flood damages associated with a 100-year flood event. This conclusion is based on the following analysis. Section 17.38.210.G is part of a section, Section 17.38.210, that pertains to coastal high-hazard areas. Coastal high-hazard areas are defined as 'located within the areas of special flood hazard.' In turn, the definition section of the flood hazard overlay zone defines 'areas of special flood hazard' and 'special flood hazard area' as those areas that are subject to a one percent or greater chance of flooding in any given year, or stated in another way, areas subject to inundation from the waters of a one-hundred-year flood. Thus the purpose of the standards applicable to the coastal high-hazard area is to provide protection from the 100[-]year flood event and subsection G is specifically intended to prevent manmade alterations that have the potential to increase the risk of flood damages associated with a 100-year storm event."[1]

Summarily stated, the essence of petitioner's position is that, given that both terms are separately defined for purposes of the relevant ordinance provisions, the term "flood" in subsection G of Section 17.38.210 *cannot* be interpreted to mean "base flood." Conversely, the essence of the

---

[1] Section 17.38.030 defines "areas of special flood hazard " to mean

"the land in the flood plain subject to a one percent or greater chance of flooding in any given year. * * *"

There is a parallel definition of "special flood hazard area" in the section.

city council's interpretation is that Section 17.38.210 *as a whole* pertains to and regulates only "base flood areas"; accordingly, the potential flood damage to which subsection G refers must be from base floods, because that is the exclusive regulatory concern of the section of which subsection G is a part.

Under ORS 197.829(1)(a)-(c) and *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992), LUBA and we may overturn a local governing body's interpretation of its land use legislation only if the interpretation is contrary to the language, purpose or policy of the provisions. We have defined the test for reversibility under that standard to be whether the interpretation is "clearly wrong." *Goose Hollow Foothills League v. City of Portland*, 117 Or App 211, 843 P2d 992 (1992). In *Huntzicker v. Washington County*, 141 Or App 257, 261, 917 P2d 1051, *rev den* 324 Or 322 (1996), we explained that "clearly wrong" means that "no person could reasonably interpret the provision in the manner that the local body did."

We agree with LUBA that petitioner does not succeed in showing that the city's interpretation of Section 17.38.210.G is so contrary to the language of the provision as to be reversible under that test. Petitioner's argument presupposes that the definitions of "flood" and "base flood" in the ordinance *must* be dispositive of the interpretive question. However, the city governing body considered other language in section 17.38.210 and in the definitional section of the ordinance to be pertinent as well. Contrary to petitioner's view, the council understood the meaning of subsection G—and the word "flood" in it—to be affected by and to reflect the context of the section of the ordinance in which they appear. We cannot say that it was unreasonable for the council to treat as relevant any of the language or provisions that it considered, or that the way the council pieced those provisions together was unreasonable. Consequently, we cannot say that the resulting interpretation was "clearly wrong."

We have considered petitioner's other arguments and find that they warrant no separate discussion.

Affirmed.