Argued and submitted April 14, remanded to LUBA in part; otherwise affirmed
July 12, 2000

Doris CARLSEN,
*Petitioner below,*

*v.*

CITY OF PORTLAND,
*Respondent below,*

*and*

OREGON HOLOCAUST MEMORIAL COALITION,
*Intervenor-Respondent below.*

(LUBA No. 98-184)

ARLINGTON HEIGHTS
NEIGHBORHOOD ASSOCIATION,
*Petitioner,*

*v.*

CITY OF PORTLAND
and Oregon Holocaust Memorial Coalition,
*Respondents.*

(LUBA No. 98-185; CA A107895)

8 P3d 234

E. Michael Connors argued the cause for petitioner Arlington Heights Neighborhood Association. With him on the brief were Gregory S. Hathaway, Davis Wright Tremaine LLP, Phillip E. Grillo, Steven F. Hill, and Miller Nash LLP.

Kathryn S. Beaumont, Senior Deputy City Attorney, argued the cause for respondent City of Portland. With her on the brief was Paul Norr for respondent Oregon Holocaust Memorial Coalition.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Kistler, Judge.

DEITS, C. J.

## DEITS, C. J.

Petitioner Arlington Heights Neighborhood Association seeks review of LUBA's remand of the Portland City Council's approval of respondent Oregon Holocaust Memorial Coalition's proposal for a Holocaust memorial to be located in the City's Washington Park.[1] We affirm LUBA's decision in part and remand it in part.

We quote the facts as they are stated in LUBA's opinion:

"In 1995, the [coalition] approached the city seeking permission to place within a city park a memorial to victims of the Holocaust. After considering three possible sites, the city's Bureau of Parks and Recreation (Park Bureau) selected a site within Washington Park and asked the city council to adopt a resolution regarding use of that site for the proposed memorial. On August 9, 1995, the city council adopted a resolution that reserved a location in Washington Park for the proposed memorial, which the resolution described as a 'contemplative memorial garden.' The selected site is a 23,850-square foot clearing within the park that is zoned Open Space (OS). The site is currently used for picnicking and casual recreation uses. The site is adjacent to SW Wright Avenue and a residential neighborhood. Petitioners learned of the city's resolution shortly after it was made but did not appeal that decision.

"The proposed memorial will occupy approximately 3,500 square feet, and will feature a nine-foot high rock wall with a circumference of 50 feet, surrounded by a smaller wall, connected with walkways and landscaped areas. The site lies 220 feet from the nearest residential property line. The memorial is designed to be a 'self-guided sequential story told in words, bronze objects, granite, plants, and other stone materials.' The memorial is anticipated to draw approximately 14,200 visitors per year, and will include guided group visits such as school tours.

---

[1] The city and the coalition have appeared jointly, and we will sometimes refer to them collectively as "respondents." Where separate reference is necessary, we will call them "the city" and "the coalition," respectively. The case was consolidated before LUBA with another appeal, but the petitioner in the consolidated matter has not sought our review. Some of the plural usages in the material we quote from the city council's order, and LUBA's opinion, are explained by the status of the proceedings before those bodies.

"In 1989, the city adopted a memorial siting policy (siting policy), that provides a review process for seven different types of memorials. Approval or denial of a proposed memorial is based on specified criteria.[2] For memorial gardens, the siting policy prescribes a particular review process requiring review by Park Bureau planning staff, the Metropolitan Art Commission, the Design Review Commission, and Park Bureau Managers. The Park Bureau director is the ultimate decision-maker. The director's decision can be appealed by either the donor or citizens opposed to the project, first to the city council member in charge of the Park Bureau, and then to the city council.

"Although the siting policy has been in effect since 1989, the city has never had occasion to apply it until the present case. The city's consideration of the proposed memorial leading up to the 1995 resolution did not follow the requirements of the siting policy. After opposition to the proposed location emerged following the city's 1995 resolution, the city initiated the process prescribed in the siting policy. After conducting the required reviews and providing for two additional public meetings not required by the policy, the Park Bureau director approved the proposed memorial on April 23, 1998, based on findings of consistency with the siting policy and the Washington Park master plan. After appeals to the city council member in charge of the Park Bureau and the city council, the city council approved the proposed memorial on October 1, 1998.

---

"[2] The siting policy provides, [*inter alia*]:

"APPROVAL CRITERIA:

"As the seven basic types [of memorials] vary greatly in the impact they have upon a park, the review and process for allowing them to occur within a park should reflect those differences.

"All memorials, however, should be judged for appropriateness according to the following criteria. These criteria are intended to serve as guidelines for the reviewing body:

"[1] The person or event being memorialized is deemed significant enough to merit such an honor. The person so honored shall have been deceased for a minimum of two years.

"[2] The memorial represents broad community values.

"[3] The memorial has timeless qualities and makes a statement of significance to future generations.

"[4] The location under consideration is an appropriate setting for the memorial; in general, there should be some specific geographic justification for the memorial being located in that spot.

"[5] The location of the memorial will not interfere with existing and proposed circulation and use patterns of the park.

"[6] The memorial is compatible with the park's current or historic master plan, if existing. (If there is no current or historic master plan, the Park Bureau shall prepare a 'statement of character.') The location and design of the memorial is consistent with the character and design intentions of the park. For example, a memorial being proposed for Forest Park should be consistent with the forested character of Forest Park.

"[7] The quality, scale, and character of the memorial is at a level commensurate with the particular park setting.

"[8] The memorial contributes to the park setting from a functional or design standpoint." (Footnotes and citation to record omitted.)

In its 1998 decision, the council first concluded that the memorial is a use that is permitted outright under section 33.100.100(B)(2), the applicable provision of the city's land use regulations. That section provides, as material:

"Uses in the Park and·Open Areas category are allowed by right. However, certain facilities which are a part of a Park and Open Areas use require conditional use review. These facilities are listed below:

"a. Parks. Swimming pools; concession areas; parking areas; baseball, football, soccer, and other fields used for organized sports; and other facilities that draw spectators to events in a park, are conditional uses within a park use."

The council's order explains, *inter alia*, why it concluded that this is an outright permitted use under section 33.100.100(B)(2):

"Based on the evidence in the record, the Council finds the proposed memorial is a 'plaza' or 'public square' and, therefore, is a park and open area use allowed by right in Washington Park. The memorial is intended and designed to provide a quiet place for self-guided education and reflection. It will contain many of the amenities the code identifies as typical of a plaza, including paving, seating, artwork, trees and landscaping. The memorial is a passive recreational use. It is not the type of facility that will regularly bring large groups of spectators together for events and that requires conditional use review under the code. It is not at all like a swimming pool, sports field, amphitheater or similar facility that regularly brings groups of people together in an organized scheduled, focused way to engage in active recreation or to watch a game or show. Although groups of people may visit the memorial from time to time, most of the projected visits to the memorial will be by the individuals, and will be self-scheduled and self-directed. People visiting the memorial, whether alone or as part of a school or tour group, will not be 'spectators' and visits to the Memorial will not be 'events' within the contemplation of PCC 33.100.100.B.2.a.[1] Accordingly, the Council finds the proposed memorial is allowed by right in the OS zone and requires no conditional use or other land use review."

---

"[1] An 'event' is defined as 'a happening or occurrence, especially when important.' A 'spectator' is defined as 'a person who sees or watches something without taking an active part.' Persons visiting the proposed memorial, whether as individuals or as part of a tour, will be engaged in a self-guided, self-paced walk through the memorial. They will not be coming to witness an organized activity as would patrons attending a planned concert or sports activity, such as a football game or soccer game." (Citations to dictionary omitted.)

The council further concluded that the application of the city's siting policy was not independently subject to land use review procedures or to the procedural requirements for

"discretionary permits" under ORS 227.160 *et seq*. The order explains:

> "The Council finds the proposed memorial does not require a review as a land use 'permit' under ORS Chapter 227 because the memorial is a 'parks and open area use' in the OS zone and is allowed by right without any further land use review under the Zoning Code. To the extent placing the memorial in Washington Park constitutes 'development,' it is development the Council has chosen to allow as a matter of right for zoning purposes in the OS zone. This is an appropriate exercise of the discretion to regulate development granted the Council by ORS Chapter 227. [*See* ORS 227.215(3).] The Council and the Parks Bureau have also chosen to establish a separate review process for siting memorials, which is the process that has yielded this decision. This process is independent of the Zoning Code and was established for reasons unrelated to zoning regulation. The fact that it requires the exercise of discretion does not transform this review of the memorial for compliance with the Memorial Siting Policy into a 'permit' nor does it subject the memorial to review under the Zoning Code that is otherwise not required.

> "The Council concludes review of the proposed memorial for compliance with the Memorial Siting Policy is an appropriate exercise of the Council's authority and does not conflict with state land use laws."

Finally, the Council concluded that the proposal complied with the siting policy, and approved it.

Petitioner appealed to LUBA from the council's 1998 decision. It presented six assignments of error. In its first assignment, petitioner argued that the city's approval of the memorial *under the siting policy* was a "land use decision" and a "discretionary approval of a proposed development of land" and that, accordingly, it was subject to the quasi-judicial procedures for "discretionary permits" under ORS 227.160 *et seq*. Because of that, petitioner asserted that the council members were required to and had not disclosed *ex parte* contacts. *See* ORS 227.180(3). Petitioner further asserted that the city had not provided the notice and hearing rights that are required under the statutes relating to discretionary permits.

LUBA agreed with petitioner that the city's application of the siting policy was subject to ORS 227.160 *et seq*. It explained:

"By any reasonable definition, conversion of 3,500 square feet of open meadow to include a structure featuring nine-foot high granite walls constitutes a material change in the appearance or use of land, notwithstanding that the site covered by the memorial is part of a larger area that will remain unchanged.

"* * * * *

"In sum, the city argues that, because the proposed memorial is an allowed use and thus not subject to any discretionary approval criteria contained in its zoning ordinance, the city's approval under the siting policy does not constitute a development permit within the meaning of ORS 227.160(2).

"The difficulty with the respondents' argument is that it does little to explain the role of the siting policy in approving the proposed memorial, or the anomaly of an 'allowed use' that is nonetheless subject to discretionary approval criteria. Respondents do not dispute that the siting policy contains discretionary approval criteria, and that applicants for a memorial within city parks are required to obtain the city's approval by demonstrating compliance with those criteria. Instead, respondents rely on the fact that the city has not codified the siting policy in its zoning ordinance, title 33 of the city's code, or otherwise made the siting policy part of its 'development ordinance,' as that term is used in ORS chapter 227.

"* * * * *

"Taken to an extreme, respondents' argument would allow a city to adopt different sets of discretionary approval criteria governing different types of development applications, but only those criteria codified in a denominated 'development ordinance' would be subject to the requirements of ORS chapter 227. It is inconsistent with ORS 227.215(2) and 227.173(1) for a city to create 'stand alone' sets of discretionary approval criteria and apply those criteria to approve the development of land without regard to the requirements of ORS chapter 227, merely because those criteria are not codified in the city's zoning ordinance.

"Stated differently, it is immaterial that the proposed memorial is a 'plaza' or 'public square' and thus an allowed use not subject to discretionary approval criteria contained in PCC title 33, where such memorials are nonetheless subject to discretionary approval criteria contained in other parts of the city's legislation. We conclude that the siting policy 'regulates the development of land' by requiring 'compliance with the terms of a development permit' and is thus properly considered part of the city's 'development ordinance' for purposes of ORS chapter 227, notwithstanding that it is not codified in PCC title 33." (Footnote omitted.)

Based on its conclusion that the city's application of the siting policy had to comply with the procedural requirements of ORS 227.160 *et seq.*, LUBA held that a remand was necessary for the disclosure of *ex parte* communications and an opportunity for rebuttal pursuant to ORS 227.180(3). However, because it concluded that petitioner's other assertion of procedural error under the first assignment was relevant only to the city's separate 1995 decision, which petitioner had not appealed, LUBA held that that argument provided no basis for relief.

In its second assignment to LUBA, petitioner contended that, because the siting policy was not acknowledged pursuant to ORS 197.610 *et seq.*, it could not serve as the substantive basis for the approval of a permit. LUBA denied the second assignment. In its third, petitioner argued to LUBA that the city council had erred in interpreting section 33.100.100(B)(2) and related provisions of the City code as permitting the memorial use outright rather than making it subject to a conditional use permit requirement. LUBA concluded that it did not have to reach that assignment or the two succeeding ones in the present appeal, given its rulings on the other assignments and its resulting remand. LUBA then rejected petitioner's sixth and final assignment, which was to the effect that the city council members were actually biased.

Petitioner argues in its three assignments to us that LUBA erred in each of the rulings that it made that were adverse to petitioner's assertions. Before turning to those assignments, however, we find it necessary to address a jurisdictional question that may or may not be presented in

respondents' brief but that, even if it is not, we are required to address *sua sponte*. Respondents state:

> "LUBA did not accept petitioner's invitation to direct the City to review the memorial as a conditional use.
>
> "The end result of LUBA's decision on petitioner's first and second assignments of error below is appropriate and reasonably resolves the procedural errors petitioner asserted. Although respondents argued to LUBA that the [siting] Policy isn't part of our development ordinance and disagree with LUBA's conclusion that it is, respondents chose not to cross-petition for review because we are ultimately satisfied with the scope of LUBA's ruling and our ability to comply with it. Once LUBA concluded the Policy is subject to the substantive and procedural requirements of the land use statutes, LUBA correctly and narrowly disposed of petitioner's ex parte contact and bias claims. While respondents do not agree with the winding path that led LUBA to its conclusion, we accept LUBA's application of that conclusion to the claims petitioner asserted."

Respondents nevertheless continue:

> "If the court reexamines the Policy as petitioner urges, respondents agree petitioner's argument has some merit— at least to the extent petitioner contends the Policy is not part of the City's development ordinance.[2] As we argued at LUBA, the Policy is not a land use regulation and was not adopted as part of the City's zoning code. The Council adopted it for purposes unrelated to land use planning a decade ago.
>
> "* * * * *
>
> "Petitioner's convoluted argument and LUBA's somewhat tortuous reasoning highlight the difficulty of attempting to squeeze the Policy into a box it doesn't fit. The Policy simply wasn't designed to be a land use regulation and isn't a land use regulation."

 We believe that it is necessary for us to consider the correctness of LUBA's characterization of the siting policy as

---

[2] Petitioner's *essential* point is that, given its putative unacknowledged status, the siting policy cannot serve as the basis for allowing a discretionary permit. Petitioner's concern is only incidentally, if at all, with whether the policy is or is not codified in any particular place or manner.

a type of local land use legislation to which the permit requirements of ORS 227.160 *et seq.*—and the definition of "land use decision" in ORS 197.015(10)—apply, because the question is jurisdictional. The siting policy's putative status as a land use regulation is the only thing that provided LUBA with jurisdiction over the appeal under its own analysis. Further, one of the questions that LUBA did not reach—whether the city was correct in holding that the use was permitted outright rather than conditionally—is also of jurisdictional import, in that it involves the application of a land use regulation. *See* ORS 197.015(10)(a)(A)(iii); ORS 197.825 (application of "land use regulation" is a "land use decision" subject to LUBA's jurisdiction). Consequently, we will address those questions as a preliminary matter.

ORS 197.015(11) defines "land use regulation" as

"any local government zoning ordinance, land division ordinance adopted under ORS 92.044 or 92.046 or similar general ordinance establishing standards for implementing a comprehensive plan."[3]

---

[3] Relatedly, ORS 227.215 provides, in material part:

"(1) As used in this section, 'development' means a building or mining operation, making a material change in the use or appearance of a structure or land, dividing land into two or more parcels, including partitions and subdivisions as provided in ORS 92.010 to 92.285, and creating or terminating a right of access.

"(2) A city may plan and otherwise encourage and regulate the development of land. A city may adopt an ordinance requiring that whatever land development is undertaken in the city comply with the requirements of the ordinance and be undertaken only in compliance with the terms of a development permit.

"(3) A development ordinance may provide for:

"(a) Development for which a permit is granted as of right on compliance with the terms of the ordinance;

"(b) Development for which a permit is granted discretionarily in accordance and consistent with the requirements of ORS 227.173;

"(c) Development which need not be under a development permit but shall comply with the ordinance; and

"(d) Development which is exempt from the ordinance."

The significance of the term "development ordinance," in LUBA's opinion and in the part of our opinion that follows, is that the "permit" procedures required by ORS 227.160 *et seq.* apply, *inter alia*, to "discretionary approval[s] of a proposed development of land under ORS 227.215[.]" A city's final decision on a permit application is reviewable by LUBA as a land use decision, ORS 227.180(2), in the same manner that a decision applying a land use regulation is. As relevant here, the distinction *could* become pertinent in only one way: The application of a development

It is clear—and undisputed—that section 33.100.100(B)(2) of the city code is part of a land use regulation. Petitioner contended in its third assignment of error to LUBA that the city's conclusion that the memorial is allowed outright, and is not subject to a conditional use permit requirement under the code section as a facility "that draws spectators to events in a park," rests on an artificial "distinction between organized/scheduled activities and self-scheduled/self-directed activities" that is inconsistent with the language of the section.

■ In considering this question, it is important to understand that, under ORS 197.829(1) and *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992), LUBA and the reviewing courts may reject a local governing body's interpretation of the locality's land use legislation only if the interpretation is "clearly wrong." As we explained in *Huntzicker v. Washington County*, 141 Or App 257, 261, 917 P2d 1051, *rev den* 324 Or 322 (1996), the reviewing tribunal may not reverse a local interpretation under that test unless it is able to say that "no person could reasonably interpret the provision in the manner that the local body did." We cannot say that about the city council's interpretation here. The city construed the phrase in question to refer to organized events, like concerts and ball games, that have as a principal purpose the attraction of substantial numbers of spectators. Hence, the phrase does not encompass facilities that may, on occasion, attract organized tours of varying sizes, but whose principal planned public use is more individual or small in scale and random in occurrence. There are obvious differences in the potential land use impacts of the two things between which the council distinguished, and there is nothing unreasonable about the distinction itself or about the council's reading of the language of the provision as lending itself to that distinction.

---

ordinance is subject to the specific procedures of ORS 227.160 *et seq*, which in some respects exceed those that are applicable to land use decisions generally. However, because we conclude that the siting policy is neither a development ordinance nor a land use regulation, the distinction assumes no dispositive importance in this case.

Petitioner made one other argument in its third assignment to LUBA concerning the city council's interpretation of the local provisions that the city found relevant to whether the use is permitted or conditional. In our view, that argument is also without merit and, in any event, the aspect of the council's interpretation that we have discussed above is independently decisive. Petitioner also asserted that the factual underpinnings of the city's interpretation are not supported by substantial evidence. In our view, however, there is no relevant evidentiary or factual question that bears on the legal issue of whether the proposed use is permitted outright or requires a conditional use permit under section 33.100.100. We hold that the city did not err in its interpretation of the city legislation or in its conclusion that the use is a permitted one.

Because the city's decision entailed the application of section 33.100.100, a provision of its land use regulations, it follows, without more, that the city's action was a land use decision over which LUBA had jurisdiction. That fact assumes particular importance, because we do not agree with LUBA's implicit conclusion that it had jurisdiction over the city's decision on the alternative ground that the siting policy itself is a provision of either a land use regulation or a development ordinance subject to ORS 227.160 *et seq.*[4]

We first point out that the siting policy does not purport to, and by its terms does not, establish land use standards for the city's action on applications for permits or uses. Rather, its criteria, which serve only "as guidelines for the reviewing body," are concerned with social, historical, aesthetic and other normative values that have no stated or logical bearing on whether a particular memorial is permissible as a land use. In reaching its conclusion that the siting policy nevertheless contains land use approval standards, LUBA seemed to have reasoned in part that a use of the substantial size and scope of the one in question must necessarily be subject to some land use approval standards and,

---

[1] To whatever extent the nature of the siting policy loses its jurisdictional significance, given that LUBA had jurisdiction for an alternative reason, we will nevertheless discuss that issue at this preliminary point, in order to provide an overview and context for our later discussion and disposition of petitioner's specific assignments of error—particularly its third.

hence, the criteria in the siting policy must necessarily be such standards.

However, quite apart from the siting policy, the proposed memorial *is* subject to a city land use regulation, namely, section 33.100.100 and related provisions of the code. The fact that the memorial is permitted outright under that section does not make the section any the less a land use regulation that applies to the use. It is true, at least arguably, that the city *could* have enacted additional land use regulations that govern this particular use more specifically and restrictively than section 33.100.100 does. However, that abstract fact, taken together with the fact that the siting policy applies to the proposed memorial, does not *ipso facto* mean that the siting policy is a *land use* regulation when, by its own clear terms, it does not purport to be one. As discussed below, the City could and did make the permissibility of memorials on City property subject to compliance with the land use requirements of chapter 33 of the code *and* with the *separate* requirements of the siting policy that regulate matters other than land use.

LUBA was also concerned that, if the various city enactments were viewed and applied as the city did, there would be a resulting "anomaly" in which a supposedly "allowed use" is "nonetheless subject to discretionary approval criteria." However, we discern no anomaly in the situation, let alone one that supports or requires the conclusion that the discretionary criteria in the siting policy are land use approval standards. It is a truism that many if not most human activities are subject to regulation of more than one kind. To illustrate by use of a hypothetical, a zoning code may establish various standards for whether and where a medical office use may be conducted. However, the fact that a particular facility satisfies those zoning standards does not mean that it may be used as a medical office without the involvement of professionally licensed personnel and, correspondingly, the latter restriction does not signify that the medical licensing requirements are zoning regulations.

The siting policy here is analogous to the medical licensing requirements in the hypothetical. Indeed, far from

giving rise to an anomaly, the fact that the proposed memorial is subject to both the siting policy and a land use regulation under which it is permitted outright tends to bolster the conclusion that the siting policy is not a land use regulation. Rather, as its language and context also clearly indicate, it is a provision that has an entirely separate regulatory concern that is concurrently applicable to a proposed use that, independently of that provision, satisfies all pertinent city land use criteria.[5]

■　　　With the foregoing as prologue, we turn to petitioner's three assignments of error. In the first, petitioner argues that LUBA erred insofar as it held that the city's 1995 and 1998 actions were separately final and appealable and that putative errors affecting only the 1995 action could not be raised in this appeal from the later decision. Petitioner acknowledges that the city's procedures "[require] a two-step review process." It contends, however, that the decision reached at the first stage "was not final until the city completed the overall two-step decision making process."

■　　　Petitioner's argument seems to assume that, in *all* multi-stage land use review settings, "finality" and "appealability" can occur only at the last stage and the results at the earlier stages are necessarily interlocutory. However, in a variety of contexts, we have held that local decisions rendered at the early stages of multi-stage review processes can be final and, if they are, issues that could have been raised in an appeal or review proceeding at an earlier stage are not cognizable in an appeal to LUBA from a later decision. *See, e.g., Knee Deep Cattle Co. v. Lane County*, 133 Or App 120, 890 P2d 449 (1995); *Dept. of Land Conservation v. Crook County*, 124 Or App 8, 860 P2d 907 (1993); *Bienz v. City of Dayton*, 29 Or App 761, 566 P2d 904, *rev den* 280 Or 171 (1977); *see also Beck v. City of Tillamook*, 313 Or 148, 831 P2d

---

[5] Relatedly, both Oregon appellate courts have recognized in other contexts that a process culminating in a single consummated action can be subject to land use laws in some of its particulars, but not in others. *See, e.g., Heritage Enterprises v. City of Corvallis*, 71 Or App 581, 693 P2d 651, *aff'd* 300 Or 168, 708 P2d 601 (1985) (governing body's action approving annexation proposal for submission to voters is reviewable as a "land use decision," but approval or rejection of proposal by voters is not).

678 (1992). While we do not suggest that *all* early stage decisions are final and appealable, petitioner cannot demonstrate that LUBA erred in holding that the one in question was final on the sole strength of an argument that depends on the incorrect premise that *none* can be.[6]

Petitioner's second assignment of error does not merit discussion. In its third assignment to us, petitioner urges that LUBA missed the point of, and therefore erred in rejecting, petitioner's second assignment to it. Petitioner appears to be correct in suggesting that LUBA's opinion does not seem responsive to the point of petitioner's argument. However, no reversible error resulted, because petitioner's point is wrong. It contends that, because the siting policy has not been acknowledged as complying with the goals, the city could not properly apply the policy as either a "land use regulation" or a "development ordinance" in making a decision under ORS 227.160 *et seq.* As we have held earlier, however, the role of the siting policy is not that of a regulation of land use or development, and the requirements of ORS 227.160 *et seq.* are irrelevant to its application. We reject petitioner's third assignment.[7]

The question that remains is the appropriate disposition. Although technically, we have not reversed any of LUBA's *holdings,* we have concluded that a significant aspect of its reasoning was incorrect. We have also decided one of the central issues in the case that LUBA did not reach. The combined effect of those two components of our opinion may be that this controversy is closer to finality than it appeared to be under LUBA's opinion, standing alone. In our view, the remaining assignments of error to LUBA—the fourth and fifth—are in a posture to be decided before any remand to the city that may be deemed necessary takes place.[8]

---

[6] The putative procedural rights that are involved in this assignment of error were claimed by petitioner in connection with its argument that the city's application of the siting policy is subject to the requirements of ORS 227.160 *et seq.* As we have discussed earlier, LUBA agreed with that argument, but we do not. Given the basis for our disposition of the assignment, it is unnecessary for us to decide whether the assignment also fails along with the argument that underlies it.

[7] It is unnecessary for us to comment on petitioner's premise that only acknowledged local legislation can be applicable in proceedings that are subject to the "discretionary permit" statutes.

[8] Because respondents did not cross-petition or cross-assign error to LUBA's remand on the *ex parte* contact issue, we do not reach it, although, logically, the

We have also considered whether it is appropriate for us to decide the fourth and fifth assignments, as we did the third, or to remand them for an initial decision by LUBA. Under the standards described in *Recovery House VI v. City of Eugene*, 150 Or App 382, 388-90, 946 P2d 342 (1997), we conclude that a remand to LUBA is the better course. In so doing, however, we note that much that we have said in other connections in this opinion may be relevant to the disposition of the fourth and fifth assignments.

Remanded to LUBA for consideration of petitioner's fourth and fifth assignments of error and for further proceedings not inconsistent with this opinion; otherwise affirmed.

---

basis for the remand would appear to disappear with our conclusion that ORS 227.160 *et seq.* has no bearing here. In any event, LUBA may reconsider its disposition as part of and in light of its determinations on remand, as well as our determinations in this opinion.