Argued and submitted February 16; reversed and remanded on petition,
affirmed on cross-petition May 3, 2017

CENTRAL OREGON LANDWATCH,
*Respondent*
*Cross-Petitioner,*

*v.*

DESCHUTES COUNTY,
*Respondent,*

*and*

PINE FOREST DEVELOPMENT, LLC,
*Petitioner*
*Cross-Respondent.*

Land Use Board of Appeals
2016065; A163908

396 P3d 968

Steven Hultberg and Seth King argued the cause for petitioner-cross-respondent. With them on the briefs were

Radler White Parks & Alexander LLP; and Robert L. Aldisert, and Perkins Coie LLP.

David Doyle filed the brief for respondent.

Paul D. Dewey argued the cause and filed the brief for respondent-cross-petitioner.

Before Ortega, Presiding Judge, and Egan, Judge, and Lagesen, Judge.

**LAGESEN, J.**

Petitioner Pine Forest Development, LLC (Pine Forest) seeks judicial review, and respondent Central Oregon LandWatch (LandWatch) cross-petitions for review, of an order of the Land Use Board of Appeals (LUBA) that remands to respondent Deschutes County (the county)[1] its decision approving Pine Forest's proposal to expand the Caldera Springs destination resort. The resort was approved in 2006 under the destination-resort land use statutes, ORS 197.435 to 197.467, which were promulgated in accordance with Statewide Planning Goal 8. Pine Forest raises two assignments of error, arguing that (1) LUBA's order was an impermissible collateral attack on prior county decisions concerning the resort and (2) LUBA erred in concluding that certain individual bedrooms in 38 of the resort's vacation homes—which we shall refer to as the "lock-off rooms"—which have full bathrooms and lockable interior and exterior doors, are not overnight lodging units, as defined in ORS 197.435(5)(b), for purposes of meeting the criteria for a destination resort under ORS 197.445(4)(b). LandWatch, in its cross-petition, contends that an expansion of a destination resort is not allowed under ORS 197.445 unless the proposed expansion area meets all of the criteria as a standalone resort and that LUBA erred in concluding otherwise.

On review to determine whether LUBA's order is unlawful in substance, ORS 197.850(9)(a), we conclude that LUBA correctly determined that ORS 197.445 does not prohibit the approval of a proposed expansion of a destination resort provided either that the proposed expanded resort, as a whole, satisfies all applicable statutory requirements for the siting of a destination report, or the expanded area,

---

[1] The county submitted an answering brief after LandWatch filed its cross-petition and answering brief to Pine Forest's petition. LandWatch moved to strike the county's brief, asserting that the brief did not answer the issue put forth in LandWatch's cross-petition but, rather, echoed the argument's put forth in Pine Forest's petition, and, thus, the county should have filed a petition within 21 days of LUBA's decision, ORS 197.850(3), or a cross-petition within seven days of the filing of the petition, ORAP 4.68. Put differently, LandWatch asserts that the county "cannot file a petitioner's brief in the guise of a respondent's brief." For its part, the county asserts that its answering brief was a "concurrence" to the issues raised in Pine Forest's petition. We need not decide if the county's brief was permissible, however, because the issues and arguments it raises are duplicative of those raised by Pine Forest or not relevant to our analysis.

on its own, meets all applicable requirements. We therefore affirm on the cross-petition. As to LUBA's conclusion that that the lock-off rooms do not qualify as overnight lodging under ORS 197.435(5)(b), we agree with Pine Forest that LUBA misconstrued the statute in reaching that conclusion. We disagree, however, with Pine Forest's assertion that the lock-off rooms qualify as "overnight lodgings" as a matter of law under a correct interpretation of the statute and, for that reason, remand to LUBA to consider the matter in the first instance. We therefore reverse and remand on the petition.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A.  *Legal Framework*

To provide context, we first summarize the state and local law applicable to the siting of a destination resort in Deschutes County. Statewide Planning Goal 8 speaks to the siting of destination resorts in Oregon. The purpose of Goal 8 is to "'satisfy the recreational needs of the citizens of the state and visitors and, where appropriate, to provide for the siting of necessary recreational facilities including destination resorts'" without the need for an exception to the resource goals if certain criteria are met. *Friends of Marion County v. Marion County*, 233 Or App 488, 494-95, 227 P3d 198 (2010) (quoting Goal 8).

To implement Goal 8's objectives regarding the siting of destination resorts, the legislature enacted ORS 197.435 through 197.467. Those statutes set forth the criteria that a proposed resort must meet to be approved as a destination resort. The statutes define a destination resort as "a self-contained development that provides for visitor-oriented accommodations and developed recreational facilities in a setting with high natural amenities." ORS 197.445. Further, the legislature has found that destination resorts are intended "to promote Oregon as a vacation destination and to encourage tourism as a valuable segment of our state's economy," that Oregon has "a growing need to provide year-round destination resort accommodations to attract visitors and encourage them to stay longer," and that it is a "difficult and costly process to site and establish destination resorts in rural areas of this state." ORS 197.440.

For destination resorts sited in "eastern Oregon,"[2] ORS 197.445 sets forth a number of criteria for "proposed developments." A proposed development must have at least 160 acres with half of the site reserved for permanent open space and must include a $7 million expenditure[3] on recreational facilities and visitor-oriented accommodations. Residential homes can be included in a destination resort, but the resort must have at least 150 overnight lodging units and the ratio of residential homes to overnight lodging units cannot exceed 2.5 to 1. ORS 197.445(4)(b)(A), (E). Under ORS 197.435(5)(b), "overnight lodgings" for destination resorts located in eastern Oregon are defined as:

> "permanent, separately rentable accommodations that are not available for residential use, including hotel or motel rooms, cabins and time-share units. Individually owned units may be considered overnight lodgings if they are available for overnight rental use by the general public for at least 38 weeks per calendar year through a central reservation system operated by the destination resort or by a real estate property manager, as defined in ORS 696.010. Tent sites, recreational vehicle parks, manufactured dwellings, dormitory rooms and similar accommodations do not qualify as overnight lodgings for the purpose of this definition."

Deschutes County, in turn, has enacted its own ordinances to govern the approval of destination resorts proposed to be sited in the county. Pertinent to the issues in this proceeding, Deschutes County Code (DCC) 18.113.025[4]

---

[2] "Eastern Oregon" includes counties that are east of the western boundaries of Wasco, Jefferson, Deschutes and Klamath counties. ORS 321.805(3).

[3] The statute requires a $7 million expenditure, but current expenditures are adjusted based on the Consumer Price Index. ORS 197.445(8).

[4] DCC 18.113.025 provides:

"Expansion proposals of existing developments approved as destination resorts shall meet the following criteria:

"A. Meet all criteria of DCC 18.113 without consideration of any existing development; or

"B. Meet all criteria of DCC 18.113 for the entire development (including the existing approved destination resort development and the proposed expansion area), except that as to the area covered by the existing destination resort, compliance with setbacks and lot sizes shall not be required.

"If the applicant chooses to support its proposal with any part of the existing development, applicant shall demonstrate that the proposed expansion will be situated and managed in a manner that it will be integral to the remainder of the resort."

authorizes the county to approve an expansion of an existing resort if either (1) the proposed expanded resort, viewed as a whole, satisfies the criteria for approval as a destination resort; or (2) the expanded portion, standing alone, meets the criteria for approval as a destination resort.

B. *The Proposed Expansion of the Caldera Springs Destination Resort*

We turn to the particulars of this case. In 2006, the county approved the conceptual master plan (CMP) for the Caldera Springs destination resort on 390 acres of land south of Bend and adjacent to the Sun River destination resort. Caldera Springs includes 320 single-family residential homesites. The resort also includes 38 of what the resort calls "Caldera Cabins," each of which are privately owned by individuals or entities other than the resort. Each cabin is a three, four, or five bedroom single-family residence that has an added feature—namely, each bedroom has a full bathroom as well as lockable inside and outside entrances. These rooms are referred to as "lock-off rooms." Caldera Springs relies on these cabins, or rather each of the cabin's lock-off rooms, to satisfy the requirement under ORS 197.445(4)(b) that a destination resort must provide at least 150 "overnight lodging" units.

After its initial approval, the resort purchased adjacent land from the United States Forest Service—614 acres of forest land consisting of lodgepole and ponderosa pines and typical high desert understory plants—zoned as forest and subject to overlay zones for wildlife area (for deer migration) and destination resorts. In 2015, Pine Forest submitted an application to the county under DCC 18.113.025 to modify the Caldera CMP to include an expansion of the resort onto the 614 acres. Of the 614 acres, the proposed expansion would apportion 490 acres (125 acres would remain undeveloped for deer migration) to accommodate up to 395 new single-family houses, which would bring the number of single-family houses in the resort to a total of 715. Also proposed was an increase to change the ratio of residential units to overnight lodgings units from 2:1 to 2.5:1, as allowed by ORS 197.445(4)(b)(E). To satisfy its obligation to provide the required number of overnight lodging units, Pine Forest proposed to construct an additional 95 overnight lodging

units, also employing the Caldera Cabin model—individually owned homes with three to five lock-off rooms. Pine Forest did not attempt to demonstrate that the expanded portion of the resort, on its own, would meet the criteria to be approved as a destination resort. Instead, as contemplated by DCC 18.113.025(B), Pine Forest sought to demonstrate that the proposed expanded development, as a whole, would meet the criteria to be approved as a destination resort.

The county hearings officer held several hearings regarding the proposed expansion. LandWatch, in opposition to the proposed development, argued that the Caldera Cabins were merely 38 luxury homes and, therefore, could not be counted as 152 overnight lodging units for purposes of the requirements of ORS 197.445. In particular, LandWatch asserted that the lock-off rooms contained in the Caldera Cabins could not be counted as separate overnight lodging units for purposes of determining whether the proposed expanded resort met the requirements of ORS 197.445. LandWatch submitted an annual report prepared by the resort in 2014 in compliance with ORS 197.445(9) demonstrating that, for that year, none of the lock-off rooms had been separately rented.[5]

The hearings officer ultimately determined that Pine Forest's application should be approved, but expressed skepticism about the extent to which the lock-off rooms met Pine Forest's overnight lodgings obligations. The hearings officer found that the annual report

---

[5] ORS 197.445(9) provides:

"When making a land use decision authorizing construction of a destination resort in eastern Oregon, as defined in ORS 321.805, the governing body of the county or its designee shall require the resort developer to provide an annual accounting to document compliance with the overnight lodging standards of this section. The annual accounting requirement commences one year after the initial lot or unit sales. The annual accounting must contain:

"(a) Documentation showing that the resort contains a minimum of 150 permanent units of overnight lodging or, during the phase-in period, documentation showing the resort is not yet required to have constructed 150 units of overnight lodging.

"(b) Documentation showing that the resort meets the lodging ratio described in subsection (4) of this section.

"(c) For a resort counting individually owned units as qualified overnight lodging units, the number of weeks that each overnight lodging unit is available for rental to the general public as described in ORS 197.435."

"proves the point that at least in that year each of the 'cabins' was rented in total, and there was not even one instance in which a single bedroom was rented separately from the rest of the home.[6] [LandWatch] argues that at best these rooms should be categorized as 'dormitory rooms' which do not qualify as overnight rentable units under either ORS 197.435(5)(b) or DCC 18.113.060."

The hearings officer also found that there

"is no dispute that the units are contained within what otherwise appears to be a single family residence. The distinction is that each bedroom has a separate entrance and a separate bathroom. The applicant states that each of the rooms is separately rentable based on the reservation system. Again, the 2014 rental report shows the homes broken down by bedroom—even if all bedrooms in each home that year were always rented by one guest. This circumstance is preferred by most guests, the applicant argues."

Ultimately, the hearings officer concluded that

"the applicant's system for making 'rentable units' available for overnight accommodation complies with DCC 18.113.060 and the definitions in 18.04.030. There is no evidence which would cause the Hearings Officer to doubt the veracity of the applicant's statements (see also the letter from Caldera Springs at Exhibit 5 of the applicant's December 25, 2015 letter)[7] or the information about the

---

[6] The 2014 annual report submitted to the county shows the number of nights each room in each cabin was made available for overnight rentals and were in fact rented. Although broken down by room, each room in each cabin was rented for exactly the same number of nights in 2014, *e.g.*, the rooms in 10 Caldera Cabin—10A, 10B, 10C, and 10D—were each rented for 98 nights.

[7] Also included was a letter from the property manager for 32 of the 38 Caldera Cabins stating:

"Each Caldera Cabin includes three, four or five permanent, separately rentable units. Each unit includes separate outside access, a full bathroom including a tub and/or shower and a variety of bed types including king, queen and bunk beds. Each unit can be rented separately or together with other units in the same Caldera Cabin. This is similar to a hotel suite where adjoining rooms have connecting doors to allow occupancy by the same guest."

The property manager also wrote:

"Caldera Springs could have elected to construct a 150-unit hotel, or two 75-unit hotels utilizing the same exact rooms and amenities as are provided in each Caldera Cabin. Families, extended families and groups of families, however, prefer a cabin setting where they can stay together rather than booking a group of hotel rooms."

Caldera Springs website as presented by [LandWatch].[8] Caldera Springs has interpreted the state definition of '[o]vernight lodging' in a way that turns a large single family residence into a 'cabin', and a five bedroom five bath house into five 'rentable units.' With the addition of the separate entrance for each bedroom and at least the colorable claim to allowing each room to be rented individually, Caldera Springs appears to have finessed DCC 18.113.060 in a way that minimally satisfies the 150 separate rentable unit standard.

"Although [LandWatch] clearly condemns the method that Caldera Springs uses for renting out the homes, there is no evidence that the Hearings Officer has been pointed to in the record that the 38 houses are really simply used as full or part time residences—which is the heart of the standards set in the destination resort statute. And, while additional evidence (such as a deliberate system of actively discouraging the separate rental of individual bedrooms, or a pricing scheme that accomplished the same result) may have swayed the Hearings Officer to find noncompliance, that evidence does not appear to be in the record. I did not visit the website to search for such evidence since it is outside the record. There also is little help in the legislative findings for ORS 197.435 which might require a conclusion that Caldera Springs's current rental system is forbidden. Consequently, the Hearings Officer finds that the application meets this criterion.

"For all the same reasons stated above, I also find that Caldera Springs's rental system does not transform the rooms or homes into a 'dormitory.'"

---

[8] LandWatch submitted screenshots from the Caldera Springs website. One screenshot included the heading "All Caldera Cabins" and the subheading "38 Vacation Rentals in All Caldera Rentals." Another screenshot described two categories of overnight lodging, the Caldera Cabins, which were marketed as "the perfect place to get away or get together. These two and three bedrooms provide all the luxury you want for your special vacation" and the "custom vacation homes," which "offer high end accommodations for larger families and groups[,] can range from three to five bedrooms and provide unrivaled amenities." LandWatch also submitted a screenshot for an individual "Caldera Cabin," in which the potential renter could make a reservation for the four-bedroom cabin, described as a 2,522 square foot 4 bedroom, 5 bath home with a view of the golf course and which included a master bedroom, two additional bedrooms, and a fourth bedroom with 2 bunk beds and a sofa sleeper. Additional screenshots of other individual vacation homes similarly described the accommodations. None of the screenshots mentioned that the bedrooms were available as separate rentals, or even that the bedrooms included separate outside access.

(Underscoring and fourth brackets in hearings officer's findings.)

LandWatch appealed the hearings officer's decision to the county's board of commissioners, which declined to hear the appeal. LandWatch then appealed to LUBA, asserting, among other arguments, that (1) the destination resort statutes do not permit the expansion of a resort; and (2) the proposed expansion did not provide for the requisite number of overnight lodging units because, in LandWatch's view, the lock-off rooms do not qualify as overnight lodgings under ORS 197.435(5)(b) and ORS 197.445. Defending the county's decision, Pine Forest argued that the applicable statutes do not prohibit the approval of the expansion of a destination resort, that the county correctly concluded that the lock-off rooms counted as overnight lodging units, and that LandWatch's argument to the contrary was an impermissible collateral attack on the county's previous approval of the Caldera Springs resort.

LUBA remanded the decision on several bases, but as relevant on review, concluded that the lock-off rooms did not qualify as overnight lodging units because they were not individually owned and were dormitory rooms. Before doing so, LUBA rejected LandWatch's contention that the destination resort statutes prohibited expansion of an existing resort and rejected Pine Forest's assertion that LandWatch's challenge to counting the lock-off rooms as overnight lodging units was an impermissible collateral attack on prior county decisions. Both parties timely petitioned for judicial review.

## II. STANDARD OF REVIEW

We review LUBA's order to determine whether it is unlawful in substance, ORS 197.850(9)(a), and do not substitute our judgment for that of LUBA's as to any factual issue, ORS 197.850(8).[9] In this case, the parties frame the issues on review solely as assertions that LUBA misconstrued two destination resort statutes, ORS 197.445 and ORS 197.435. We review LUBA's interpretation of those statutes for legal

---

[9] Under ORS 197.850(9)(a), we reverse or remand a LUBA order if we determine the "order to be unlawful in substance or procedure[.]"

error, employing the methodology described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). *Trautman/Conte v. City of Eugene*, 280 Or App 752, 758, 383 P3d 420 (2016) ("Because LUBA's legal conclusions involve an issue of statutory construction, we apply the principles of statutory construction set out in [*PGE* and *Gaines*]); *Zimmerman v. LCDC*, 274 Or App 512, 519, 361 P3d 619 (2015) ("The 'unlawful in substance' review standard for LUBA orders under ORS 197.850(9)(a) *** is for 'a mistaken interpretation of the applicable law.'" (Quoting *Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001).)). In conducting that review, we are obligated to interpret those statutory provisions correctly, regardless of the parties' assertions of statutory interpretation. *Gunderson, LLC v. City of Portland*, 352 Or 648, 662, 290 P3d 803 (2012) (citing *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997)).

## III. DISCUSSION

### A. *LandWatch's Cross-Petition*

We begin with the issue raised by the cross-petition—that is, whether LUBA's order is unlawful in substance because the destination resort statutes do not allow an expansion of an existing destination resort unless the expanded portion of the resort, standing alone, meets the destination resort criteria, ORS 197.445. We do so because, if LandWatch is correct as to that point, there would be no need to reach the issues raised in the petition. It is undisputed that the expanded portion of the proposed enlarged resort does not, on its own, meet the criteria to be approved as a destination resort.

LUBA rejected LandWatch's argument, determining that

> "nothing in the goal or statute limits the maximum number of residential dwellings, overnight lodging units, recreational amenities provided by a destination resort, or the maximum size of such a resort. Further, the destination resort statute expressly contemplates that destination resorts may be approved in phases. *See* ORS 197.465(3) (requiring that in phased developments recreational amenities

intended to serve a phase must be constructed prior to sales of residential units in that phase). While the Caldera resort was not initially approved as a multi-phase development, we believe that it would elevate form over substance to read the destination resort statute as allowing (1) a resort to be developed in two or more phases, but (2) prohibiting expansion of an existing resort that would offer exactly the same balance of uses and visitor-oriented accommodations that could have been approved in a multi-phase development."

On review, both parties focus on the phrase "proposed development" in ORS 197.445. That statute provides, in relevant part:

"A destination resort is a self-contained development that provides for visitor-oriented accommodations and developed recreational facilities in a setting with high natural amenities. To qualify as a destination resort under ORS 30.947, 197.435 to 197.467, 215.213, 215.283 and 215.284,[10] a *proposed development* must meet the following standards."

(Emphasis added.) LandWatch argues that the phrase "proposed development" signals the legislature's intention that, to be approved as a destination resort, a development cannot include any parts that previously have been developed. In LandWatch's view, such existing parts are not "proposed." Pine Forest, on the other hand, generally argues that that wording does not indicate an intention to preclude proposals for expanded developments that include some portion that is already developed. Based on the context of the phrase "proposed development," we agree with Pine Forest.

As an initial matter, the "following standards" to which ORS 197.445 refers include a minimum number of acres, ORS 197.445(1), fifty percent open space, ORS 197.445(2), an expenditure of $7 million on recreational facilities and visitor-oriented accommodations, ORS 197.445(3), and that it include at least 150 overnight lodging units of

---

[10] ORS 30.947 provides that the "fact that a comprehensive plan and implementing ordinances allow the siting of destination resorts or other nonfarm or nonforest uses as provided in ORS 30.947, 197.435 to 197.467, 215.213, 215.283 and 215.284, does not in any way affect the provisions of ORS 30.930 to 30.947." ORS 30.930 to 30.947 concern farming and nonforest practices and are not at issue in this review. ORS 215.213, ORS 215.283, and ORS 215.284 concern lands zoned for exclusive farm use and are also not applicable here.

overnight lodgings and a 2.5 to 1 ratio of overnight lodging units to residential units, ORS 197.445(4)(b). Significantly, as LUBA pointed out, there is no limit to a resort's size or number of overnight or residential units. Thus, to the extent LandWatch's argument is premised on the idea that the destination resort statutes are meant to restrain the size of destination resorts, the lack of any limit in the size or quantity of accommodations or residences counters that premise.

Further, other context also suggests that expansion is permitted. ORS 197.465(3) provides, in part, that, in "phased developments, developed recreational facilities and other key facilities intended to serve a particular phase shall be constructed prior to sales in that phase or guaranteed through surety bonding." Although we disagree with LUBA that that provision "expressly" contemplates that destination resorts may be approved in phases—that is, phased development does not necessarily mean phased approval—the provision does provide for phased implementation. As LUBA correctly noted, the existing resort and the proposed expansion could have been approved together as a two-step development, provided it met the criteria of the destination resort statutes and the county's code provisions. Thus, we agree with LUBA's conclusion that "it would elevate form over substance to read the destination resort statute as allowing (1) a resort to be developed in two or more phrases, but (2) prohibiting expansion of an existing resort that would offer exactly the same balance of uses and visitor-oriented accommodations that could have been approved in a multi-phase development."

In arguing for a contrary conclusion, LandWatch points out that we have narrowly construed exceptions to the goals to protect the underlying resource use, *McCaw Communications, Inc. v. Marion County*, 96 Or App 552, 773 P2d 779 (1989), and *Central Oregon LandWatch v. Deschutes County*, 276 Or App 282, 367 P3d 560 (2016), and argues that we must apply the principle guiding those cases to the siting of destination resorts. Both *McCaw* and *Central Oregon LandWatch* are inapposite to the issue in this case: Those decisions concerned statutory exceptions, under ORS chapter 215 (or a county code analog), to lands designated for exclusive farm use. The destination resort statutes are

not goal exceptions. ORS 197.450 provides, in part, that "a comprehensive plan may provide for the siting of a destination resort on rural lands *without taking an exception* to statewide planning goals relating to agricultural lands, forestlands, public facilities and services or urbanization."[11] (Emphasis added.)

Accordingly, we conclude that the relevant destination resort statutes allow for the expansion of a destination resort in the manner contemplated by DCC 18.113.025(B). But such a proposal cannot be approved as a destination resort, of course, unless the proposed development satisfies the criteria for destination resorts.[12] Fulfilling the destination resort criteria is, however, of critical importance: The developer seeking to incorporate facilities, visitor-oriented accommodations, or overnight lodgings from the existing resort into the resort expansion must establish that the entire proposed development—the existing resort and the expansion area—meets the criteria set forth in ORS 197.445. LUBA said much the same thing: "A critical caveat to [permitting expansion] is that the expanded resort, *viewed as a whole*, must meet or continue to meet all applicable standards, as we understand DCC 18.113.025 to require." (Emphasis added.)

B. *Pine Forest's Petition—Impermissible Collateral Attack*

Having concluded that ORS 197.445 does not bar the approval of a proposed destination resort that consists, in part, of an existing destination resort, we turn to the issues raised in Pine Forest's petition. In its first assignment of error, Pine Forest argues that LandWatch's assertion that the existing Caldera Cabin lock-off rooms cannot qualify as "overnight lodging" units for purposes of Pine

---

[11] ORS 197.445(6)(b), not applicable to the Pine Forest development, provides different criteria for destination resorts proposed on "land where there has been an exception to any statewide planning goal on agricultural lands, forestlands, public facilities and services and urbanization."

[12] We note that Pine Forest raises a persuasive point that LandWatch's interpretation of ORS 197.445 would preclude *any* expansion of a destination resort unless the expansion independently meets the destination resort criteria. That construction would mean that a destination resort could not expand under ORS 197.435 to 197.465 to, for example, add a new golf course to adjacent land—a "developed recreational facility" expressly provided for in ORS 197.435(1)—or to site a hotel to accommodate increased demand for overnight lodging.

Forest's proposed expanded destination resort is an impermissible collateral attack on the county's prior land use decisions approving the existing Caldera Springs resort. In Pine Forest's view, "once a land use decision is final, issues that could have been raised in an appeal of that decision are not cognizable in an appeal to LUBA from a later local land use decision."[13] Pine Forest also asserts that, because it did not specifically propose "lock-off rooms" as part of the expansion to meet its ratio of residential homes to overnight lodging units, it was error for LUBA to conclude that LandWatch could "challenge the proposed accounting of similar cabins and lock-off rooms in the expansion area."

Below, LUBA rejected Pine Forest's collateral attack argument. It explained that LandWatch was not collaterally attacking the previous approvals of the existing Caldera Springs resort, but rather was challenging whether Pine Forest's new proposal for an expanded resort met the criteria for approval:

"While petitioner cannot in this appeal challenge the existing Caldera resort's compliance with the applicable standards, it can certainly challenge the proposed accounting of similar cabins and lockoff rooms in the expansion area. Further, because intervenor proposed to count each of the lockoff rooms contained within the 38 Caldera cabins toward the total of overnight lodging units needed to ensure that the expanded resort as a whole continues to provide the minimum 150 overnight lodging units and does not exceed the 2.5 to 1 ratio between residential dwellings and overnight lodging units, we believe petitioner can challenge that proposal, and argue that the existing Caldera lockoff rooms cannot be counted for those purposes."

(Footnote omitted.)

We agree with LUBA. We highlight our conclusion that, under ORS 197.445, the "proposed development" is the entire development, both the existing resort and the

---

[13] The previous land use decisions referred to by Pine Forest are (1) the county's amendment of the CMP in 2007 to modify the dimensional standards of the lock-off units and in 2013 to update the plan to conform with changes in state law allowing availability for overnight use to be 38 weeks per year rather than 45 and (2) a declaratory judgment ruling in which, according to Pine Forest, the lock-off rooms were approved.

expansion area, and that the proposed development must satisfy the destination resort criteria as an entirely new development. Here, Pine Forest proposes expansion under DCC 18.113.025(B), which requires it to meet "all criteria of DCC 18.113 for the entire development (including the existing approved destination resort development and the proposed expansion area)." Pine Forest seeks to count the Caldera Cabin lock-off rooms to satisfy the criteria for the proposed development for purposes of what is a new and different proposal. Under those circumstances, LandWatch's argument is not susceptible to characterization as collateral attack; it is simply a request that Pine Forest's new proposal be reviewed for a determination as to whether the proposal, in fact, satisfies all applicable requirements.

Arguing otherwise, Pine Forest asserts that our holdings in *McKay Creek Valley Assn. v. Washington County*, 118 Or App 543, 848 P2d 624, *rev den*, 317 Or 272 (1993), and *Marshall v. City of Yachats*, 158 Or App 151, 973 P2d 374, *rev den*, 328 Or 594 (1999), stand for the proposition that this court "has rejected the argument that later decisions require a reexamination of the legality of earlier approvals, finding instead that a redetermination is necessary only if expressly required by the local code."

Pine Forest is wrong. In *McKay*, the petitioners challenged an application to build a dwelling on a "lot or parcel" under a local ordinance, arguing that the "lot or parcel" did not qualify as such because it was unlawfully created. 118 Or App at 545-46. We concluded that it was unnecessary to answer the question of whether the proposed development was a lawfully created parcel because the county ordinance did not expressly make the legality of the lot or parcel an approval criterion for the application to build a dwelling. *Id.* at 548. In *Marshall*, citing *McKay*, we concluded that, in the absence of a requirement that the city's legislation required a legal lot of record as a prerequisite to granting a dwelling permit, challenging the legality of the lot was inconsequential to our review of the city's permitting decision. 158 Or App at 157. Neither case, however, aids Pine Forest because the challenge to the proposed development does not hinge on whether the Caldera Cabins were lawfully created, and, more importantly, the entire proposed development must

satisfy the express destination resort criteria set out in ORS 197.445, 285 Or App at 281-82.[14]

As to Pine Forest's assertion that it did not rely on additional lock-off rooms in the proposed expansion to satisfy the overnight lodging unit requirements, that assertion is belied by the hearings officer's findings that Pine Forest "anticipates" that the 96 overnight lodging units will be located on the expansion property and that those overnight lodging units will "match the Cadera Cabin model" of the existing resort. For those reasons, we reject Pine Forest's first assignment of error.

C. *Pine Forest's Petition—Overnight Lodgings*

In the alternative to its "collateral attack" argument, in its second assignment of error, Pine Forest contends that LUBA erred in concluding that the 152 bedrooms in the Caldera Cabins—the "lock-off rooms"—do not qualify as "overnight lodging units" as defined in ORS 197.435(5)(b). As noted, a "proposed development" requires a minimum of 150 overnight lodging units and the ratio of residential homes to overnight lodging units must not be greater than 2.5 to 1. ORS 197.445(4)(b)(A), (E). For the reasons we explain below, we conclude that LUBA misconstrued ORS 197.435(5)(b) in determining that the lock-off rooms do not qualify as overnight lodgings and that a correct interpretation of the statute requires a remand to LUBA for further proceedings, including, possibly, a remand to the county for further fact-finding. As previously noted, the two relevant statutes are ORS 197.445 and ORS 197.435. ORS 197.445(4) provides:

"Visitor-oriented accommodations including meeting rooms, restaurants with seating for 100 persons and 150 separate rentable units for overnight lodging shall be provided. However, the rentable overnight lodging units may be phased in as follows:

"(b) On lands in eastern Oregon, as defined in ORS 321.805:

---

[14] Pine Forest also cites *Carlsen v. City of Portland*, 169 Or App 1, 8 P3d 234 (2000), but that decision is readily distinguishable. In *Carlsen*, we affirmed LUBA's conclusion that putative errors affecting an earlier decision by the City of Portland that was final could not be raised in an appeal from a later decision from the city. Again, this issue concerns whether the entire proposed development meets the relevant statutory criteria.

"(A)   A total of 150 units of overnight lodging must be provided.

"(B)   At least 50 units of overnight lodging must be constructed prior to the closure of sale of individual lots or units.

"* * * * *

"(E)   The number of units approved for residential sale may not be more than 2-½ units for each unit of permanent overnight lodging provided under this paragraph."

ORS 197.435(5)(b) defines "[o]vernight lodgings" as follows:

"With respect to lands in eastern Oregon, as defined in ORS 321.805, permanent, separately rentable accommodations that are not available for residential use, including hotel or motel rooms, cabins and time-share units. Individually owned units may be considered overnight lodgings if they are available for overnight rental use by the general public for at least 38 weeks per calendar year through a central reservation system operated by the destination resort or by a real estate property manager, as defined in ORS 696.010. Tent sites, recreational vehicle parks, manufactured dwellings, dormitory rooms and similar accommodations do not qualify as overnight lodgings for the purpose of this definition."

As for whether the lock-off rooms were overnight lodging units, Pine Forest argued before LUBA that "nothing in the destination resort statute requires that overnight lodging units be grouped in any particular manner, or prohibits combining multiple overnight lodging units into a single structure" and that "providing a total of 150 lockoff rooms in 38 individually owned cabins is no different than providing 150 hotel rooms in a single structure, for purposes of ORS 197.435(5)(b)." LUBA rejected that argument, reasoning that

"that argument cannot be squared with the text of the applicable statutes. Under the first sentence of ORS 197.435(5)(b), overnight lodging units can include hotel or motel rooms, cabins and time-share units, which presumably can (but need not) be owned and rented by the resort operator. The second sentence of ORS 197.435(5)(b) addresses the subset of overnight lodging units that are

'individually owned units,' and provides in part that '[i]ndividually owned units may be considered overnight lodgings if they are available for overnight rental use * * *' The pronoun 'they' refers to 'individually owned units,' and clearly it is the 'individually owned units' that must [be] 'available for overnight rental use.' In other words, an individually owned 'unit' that may be counted as an overnight lodging unit must be a unit that is 'individually owned.' The proposed lockoff rooms are not 'units' of any kind and are not individually owned, or even capable of being individually owned. They are simply bedrooms in a larger structure, a cabin, which is the only unit in the present case that is 'individually owned.'"

(Brackets and omissions in LUBA's order.)

On review, Pine Forest disputes LUBA's construction of the second sentence of ORS 197.435(5)(b) that "an individually owned 'unit' that may be counted as an overnight lodging unit must be a unit that is 'individually owned.'" That is, it disputes LUBA's conclusion that an "individually owned unit" must be owned by *separate* owners. In Pine Forest's view, the term "individually owned units" referred to in the second sentence of ORS 197.435(5)(b) refers to units that are a subset of overnight lodging units that qualify as such under the first sentence—separately rentable accommodations that are "not available for residential use." That "individually owned units" must be made available for overnight rental for 38 weeks per year means, according to Pine Forest, that "individually owned units" are privately owned units. Otherwise, Pine Forest posits, there would be no reason to impose the 38-week overnight rental requirement if the unit was owned by the resort. Moreover, Pine Forest argues, by "requiring that these units be available for rent for the vast majority of the year, it ensures that these otherwise privately owned units meet the requirement from the first sentence that they are 'not available for residential use.'"

We agree with Pine Forest that "individually owned units" means units not owned by the resort. The text indicates that for two reasons. *First*, a unit owned by the destination resort would not need a requirement that it be made available for overnight rental use because a unit owned by the resort would not ordinarily be an accommodation that

is not available to the general public. *Second*, that an individually owned unit must be made available for "overnight rental use by the general public" suggests that, but for that requirement, the unit is not available to the general public, *i.e.*, is reserved for private use because it is not owned by the resort.[15]

Further, ORS 197.445(4)(b), which sets out the criteria for overnight lodging units, suggests that "individually owned" does not mean separately owned. ORS 197.445 (4)(b)(B) requires that the developer must first construct at "least 50 units of overnight lodging" before "the closure of *sale of individual* lots or units." (Emphasis added.) That individual lots or units are *sold* by the developer suggests a meaning that individually owned means a unit that is no longer owned by the resort. Further, subparagraph (B) of ORS 197.445(4)(a), which concerns the siting of destination resorts not located in eastern Oregon, provides that at "least 75 units of overnight lodging, not including any individually owned homes, lots or units, must be constructed or guaranteed through surety bonding or equivalent financial assurance prior to the closure of sale of individual lots or units" and that the "remaining overnight lodging units must be provided as individually owned lots or units subject to deed restrictions that limit their use to use as overnight lodging units." ORS 197.445(4)(a)(B), (C). Again, "individual" and "individually" in those provisions appear to refer to units that are not owned by the resort; not necessarily units that are *separately* owned.

Moreover, LUBA's interpretation of "individually owned" to mean "separately owned" is inconsistent with the adoption history of Goal 8 and ORS 197.435(5)(b). *See Gunderson, LLC*, 352 Or at 662 (considering as relevant to discern legislative intent the adoption history of Statewide Planning Goal 15). At the early stage of the drafting of the amendment to Goal 8 by the Department of Land Conservation and Development Commission (DLCD), the

---

[15] We note that such a construction of individually owned units does not necessarily mean that the accommodations described in the first sentence of ORS 197.435(5)(b) must categorically be resort-owned, but does mean that a unit that is privately owned must be made available to the public for at least 38 weeks.

definition for overnight lodgings did not initially include the second sentence of ORS 197.435(5)(b); it was limited to defining "overnight lodgings" as "accommodations not available for full-time residential use (e.g., hotel and motel rooms, cabins or time-share units)." *Proposed Amendments to the Statewide Planning Goals to Allow Destination Resorts* (June 1984). Later, James Ross, the director of DLCD issued a memorandum that explained further DLCD's proposed amendments to Goal 8. In that memorandum, Ross explained that the existing definition did

> "not indicate under what circumstances, if any, individually owned homes or condominiums may be considered overnight lodging. This is an important 'gray area' which needs to be clarified. In some very limited circumstances the Department believes individually owned homes should be counted as overnight lodgings. The Department would consider individually owned units as overnight lodgings when 'they are available for overnight rental use by the general public for 48 weeks per year through a central reservation and check-in facility."

James Ross, DLCD Memorandum (Oct 5, 1984). The Goal 8 amendment was adopted on October 11, 1984. The proposed definition of "overnight lodgings" was substantially similar to the definition promulgated in ORS 197.435(5)(b).[16] Ross's explanation for the proposed change, which refers to individually owned homes, or condominiums, indicates that the intended meaning was privately owned homes (as we discuss below, it also indicates that "individually owned units" are a separate category of overnight lodgings rather than a subset of "separately rentable accommodations not available for residential use").

Accordingly, whether a unit is *separately* owned, or whether it is *capable of separate* ownership, as LUBA has concluded, is immaterial.[17] "Individually owned" means not

---

[16] A prior iteration of the Goal 8 amendments concerning the definition for overnight lodgings proposed the exclusion of "[t]ent sites, recreational vehicles or pads, mobile homes, dormitory rooms, and similar accommodations" which is reflected in nearly identical language in ORS 197.435(5)(b). James Ross, DLCD Memorandum (Aug 22, 1984).

[17] We note that the first sentence of ORS 197.435(5)(b) does not qualify "separately rentable accommodations that are not available for residential use" as resort-owned. Presumably, if an accommodation is "separately rentable" and "not

owned by the resort. LUBA erred by determining otherwise when it construed that phrase as separately owned.

Having concluded that LUBA erred in interpreting the "individually owned" wording of ORS 197.435(5)(b), a question remains: What does qualify as overnight lodgings under the statute and, in particular, do the lock-off rooms qualify as such lodgings? Pine Forest argues that the lock-off rooms are units of overnight lodging because they are "separately rentable accommodations" that are "identical in function" to a hotel or motel room, and that, because they are individually owned, *i.e.*, not owned by the resort, and made available for overnight rental for a minimum number of weeks to the general public, then they are not "available for residential use" and, therefore, each lock-off room necessarily qualifies as a unit of overnight lodging. That construction of ORS 197.435(5)(b), however, is untenable in two ways.

*First*, in support of that construction of ORS 197.435(5)(b), Pine Forest asserts that the individually owned units are a "subset" of what would otherwise qualify as overnight lodging under the first sentence. LandWatch responds that the first and second sentences are separate categories and that, to prevail on its argument, Pine Forest must show that the lock-off rooms fall within the category of lodging created by the second sentence. We agree with LandWatch. The first sentence addresses "separately rentable accommodations that are not available for residential use" whereas the second sentence addresses individually owned units that must be made available to the general public, which implies that individually owned units are ones that are available for residential use, at least part time. In other words, implicit in the requirement that an "individually owned unit" must be made available to the general public for part of the year is that, when the unit is not available to the general public for overnight rentals, it is available to

available for residential use," it could be owned by someone or an entity other than the resort. Further, there may be some manner of accommodation that is not resort-owned that consists of multiple units that are separate rentable units and available for residential use (such as a duplex that is available for residential use as a single unit but one or two halves of the duplex can be rented out as a separate unit)—those units must be made available to the public the minimum number of weeks.

the owner for residential use. Residential use need not mean full-time residence of a dwelling: part-time residential-use availability is consistent with private ownership of a vacation home in a destination resort.[18] Further, we reject the implication of Pine Forest's interpretation that, when the lock-off rooms are not being used as bedrooms in a vacation home, *i.e.*, are not being used residentially, and are rented out, they are—by virtue of an exterior door, a lockable interior door, and bathroom—"not available for residential use" for purposes of the statute. Put differently, the implication of Pine Forest's construction of the statute is that overnight lodgings are separately rentable accommodations that are *not* available for residential use *except when they are* available for residential use.[19]

We also disagree with Pine Forest that the requirement that an individually owned unit must be made available to the general public at least 38 weeks a year "ensures" that the individually owned unit meets the requirement set out in the first sentence of ORS 197.435(5)(b) that "permanent, separately rentable accommodations" are "not available for residential use." That is so because the requirement that an individually owned unit be made available to the general public was the condition of allowing, in limited circumstances, 285 Or App at 287, individually owned units to qualify as overnight lodging. That requirement was not put in place in reference to "separately rentable accommodations not available for residential use," it was put in place to explain when individually owned units could be counted as overnight lodging units.

*Second*, we reject Pine Forest's argument that the physical layout of the lock-off rooms, which include a sleeping area and full bathrooms, and their lockable exterior doors, which permit separate entry, make them akin to a hotel or

---

[18] We note that a previous version of Goal 8 defined overnight lodgings as "accommodations not available for *full-time* residential use." 285 Or App at 287. The modifier "full-time" was removed when the provision allowing individually owned units to qualify as overnight lodging was added, suggesting that the definition as enacted meant that "available for residential use" was not limited to full-time residences.

[19] Presumably, a resort-owned single-family house, condominium, townhouse, or duplex could qualify as overnight lodging as defined in the first sentence if it is never available for residential use.

motel room. Although the lock-off rooms themselves may have some physical features of hotel rooms or motel rooms, the similarities end there. The lock-off rooms are not part of an establishment that provides services or hospitality associated with hotels or motels. That is, a "hotel" is a "building of many rooms chiefly for overnight accommodation of transients and several floors served by elevators" that includes features such as a lobby, meeting rooms, restaurants, and personal services. *Webster's Third New Int'l Dictionary* 1094-95 (unabridged ed 2002); *see also Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014) ("[A]s stilted as the approach may sometimes seem, we frequently consult dictionary definitions of the terms, on the assumption that, if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended."). A "motel" is an "establishment which provides lodging and parking and in which the rooms are usually accessible from an outdoor parking area." *Webster's* at 1474. The Caldera Cabins, which are single-family residences, do not offer the amenities or services of a commercial, overnight-lodging establishment.[20]

Thus, under this construction of the definition for "overnight lodgings," a unit generally can qualify in one of two ways: either as (1) "separately rentable accommodations

---

[20] Nor are they cabins. The hearings officer found that there "is no dispute" that the lock-off rooms are contained within what "otherwise appears to be a single family residence." Although Caldera Springs evocatively markets the Caldera Cabins as "cabins," they are built in the form of single-family residences featuring amenities that have little in common with the ordinary meaning of a cabin—a "small one-story low-roofed dwelling usually of plain construction * * * used during a vacation especially for hunting and fishing" or a "small typically one-room house suitable for overnight lodging for tourists." *Webster's* at 309. Pine Forest does not assert, nor does the record indicate, that the Caldera Cabins are time-shares.

We recognize that the list of examples (motel or hotel rooms, cabins, or time-shares) of what qualifies as "separately available accommodations not available for residential use" is not an exclusive list. There may be other types of accommodations that qualify as overnight lodgings under that definition. However, the shared characteristics of those accommodations, at least in the context of a destination resort, are that they provide overnight lodging and are not available for residential use. *See State v. Kurtz*, 350 Or 65, 76, 249 P3d 1271 (2011) ("When examining the characteristics of a list of examples, for purposes of statutory interpretation, 'the court seeks to find if it can, a common characteristic among the listed examples.'" (Quoting *Schmidt v. Mt. Angel Abbey*, 347 Or 389, 405, 223 P3d 399 (2009).)).

that are not available for residential use" or (2) as "[i]ndividually owned units" that "are available for overnight rental use by the general public for at least 38 weeks per calendar year through a central reservation system operated by the destination resort or by a real estate property manager, as defined in ORS 696.010"—unless the unit is one of the types of lodging expressly excluded from the definition of overnight lodgings: "[t]ent sites, recreational vehicle parks, manufactured dwellings, dormitory rooms and similar accommodations." We examine how this construction applies to the lock-off rooms.

As an initial matter, the lock-off rooms do not qualify as overnight lodgings units under the first sentence of the definition. That is, they are bedrooms that are in a single-family home that is available for residential use.[21]

Second, although LUBA concluded otherwise, the lock-off rooms are not among those types of lodging categorically excluded from being counted as overnight lodgings. LUBA reasoned that "there appears to be no functional distinction between the Caldera lock-off room approach and providing dormitory rooms or similar accommodations that offer individual sleeping rooms with shared common areas and kitchen facilities." However, a "dormitory" is defined as "a room intended primarily to be slept in; especially : a large room providing sleeping quarters for many persons and sometimes divided into cubicles" and "a residence hall providing separate rooms or suites for individuals or for groups of two, three, or four with common toilet and bathroom facilities but usually without housekeeping facilities." *Webster's* at 675. Without belaboring the analysis, we conclude that it was error for LUBA to determine that the lock-off rooms were dormitory rooms for much the same reason we rejected Pine Forest's assertion that the lock-off rooms were akin

---

[21] The hearings officer stated that "there is no evidence that the Hearings Officer has been pointed to in the record that the 38 houses are really simply used as full or part time residences—which is the heart of the standards set in the destination resort statute." That evidence is not required, however: The first category under ORS 197.435(5)(b) is satisfied, in part, if the "separately rentable accommodations" are "not *available* for residential use." Here, because the Caldera Cabins are privately owned and are built as single-family residences, they are available for residential use.

to motel or hotel rooms: The lock-off rooms are bedrooms in a single-family vacation home and, although, there may be some physical similarities between the rooms and a dormitory room, there is little in common between these well-appointed luxury vacation homes and what would commonly be understood as a dormitory.

The remaining issue is whether the lock-off rooms qualify as overnight lodging units under the second sentence of ORS 197.435(5)(b)—"Individually owned units may be considered overnight lodgings if they are available for overnight rental use by the general public for at least 38 weeks per calendar year through a central reservation system operated by the destination resort or by a real estate property manager, as defined in ORS 696.010." Because "separately rentable accommodations not available for residential use" and "individually owned" (at least in the sense of being separately owned) are no longer operative factors as to whether the lock-off rooms qualify as overnight lodging units, the following question needs to be answered: What factors qualify a privately owned unit as an overnight lodging unit for purposes of ORS 197.445(4)(b)?

First, we note that Pine Forest's argument that lock-off rooms are "separately rentable accommodations" because "each unit is separately *available* for rent through a central reservation service," depends on the factual premise that, so long as a unit is made available through a reservation system, it is immaterial whether they are, in fact, separately rented. As we have indicated, the "separately rentable accommodation" wording from the first sentence of ORS 197.435(5)(b) is not relevant when considering whether an individually owned unit qualifies at as overnight lodging unit. However, we point out that ORS 197.445(4) provides that "150 *separate rentable units* for overnight lodging shall be provided." (Emphasis added.) Although "separately rentable accommodations" and "separate rentable units" may, at first blush, seem equivalent, the grammatical difference is significant. That is, in the phrase "separately rentable accommodations," "separately" is an adverb that modifies "rentable." Whereas, in the phrase "separate rentable unit," "separate" is an adjective that modifies "unit." Thus, a unit for purposes of meeting the destination resort criteria is

modified by both "separate" and "rentable," and, as a starting point, an overnight lodging unit must be a separate, rentable unit. And, the focus on "separate" shifts from availability and the reservation service to a more concrete, factual determination of whether the rentable unit is actually a *separate* unit. Further, we note that "separate" means "not shared with another : INDIVIDUAL, SINGLE" or "existing by itself : AUTONOMOUS, INDEPENDENT." *Webster's* at 2069.

Secondly, we note that the text of the second sentence of ORS 197.435(5)(b) states that individually owned units "*may* be considered overnight lodging units if they are available to the general public." (Emphasis added.) Although we need not go into a discussion on the precise meaning of "may" in this context, *see, e.g., Friends of Columbia Gorge v. Columbia River (S055915)*, 346 Or 415, 426, 212 P3d 1243 (2009) (noting that, "in certain contexts, the word 'may' can mean 'shall' and vice versa"), we believe that the adoption history of Goal 8 informs our analysis. As noted, Goal 8 was amended to reflect the concern that a previous iteration of Goal 8 did

> "not indicate under *what circumstances, if any, individually owned homes or condominiums may be considered overnight lodging.* This is an important 'gray area' which needs to be clarified. In *some very limited circumstances* the Department believes individually owned homes should be counted as overnight lodgings. The Department would consider individually owned units as overnight lodgings when 'they are available for overnight rental use by the general public for 48 weeks per year through a central reservation and check-in facility.'"

James Ross, DLCD Memorandum (Oct 5, 1984) (emphases added). Thus, the addition was meant to count individually owned *homes* in "some very limited circumstances." Although, the text of ORS 197.435(5)(b) refers to individually owned "units," and therefore can allow accommodation types that are not homes, we deem it significant that that allowance was meant to be a stringent requirement. Certainly, the allowance was not intended to encompass a definition of overnight lodging that was susceptible to, as the hearings officer described it, being "finessed."

Additionally, ORS 197.445(9) requires the resort developer to provide an "annual accounting to document compliance with the overnight lodging standards," indicating that compliance with the overnight lodging is an ongoing factual determination—whether a rentable unit is separate is a question of whether it is *in fact* separate and rentable, at least once the unit is in existence and not a mere proposal on paper. We also find persuasive LUBA's point that the legislative policies of the destination resort statutes, ORS 197.440, "focus on providing facilities and accommodations to attract tourists" and that "one of the main vehicles" for doing so is ensuring that there are a minimum number of overnight lodging units and limiting the ratio of residential units to overnight lodging units. As LUBA stated, the

> "proposed Caldera approach minimizes the *actual* number of separate overnight lodgings available for tourist accommodations. At best, that approach *nominally* provides 150 separate overnight lodging units, which does not seem consistent with the policies set out in ORS 197.440, to attract and accommodate tourists, at least compared to an approach that would actually provide 150 or more separate, qualified overnight lodging units."

(Emphases in original.)

Accordingly, we conclude that individually owned units, to qualify as "overnight lodgings," must be, as a factual matter, an accommodation that is both its own "separate" unit that is rentable separately from other units. Where, as here, a developer proposes an expanded destination resort that is based, in part, on existing lodgings, for an existing individually owned unit to count as "overnight lodgings" under the second sentence of ORS 197.435(5)(b), there must be evidence that the unit is in fact separate and rentable separately from other units; it is not enough that the unit is theoretically separate and separately rentable, particularly when there is affirmative evidence the claimed separate unit of lodging is, in reality, neither separate nor separately rentable. In concluding that the lock-off rooms did not qualify as overnight lodging, LUBA applied a different—and, as we have explained, mistaken interpretation of ORS 197.435(5)(b). That renders its order unlawful

in substance. For that reason, we remand to LUBA for further consideration of the issue under a correct interpretation of the law.

Reversed and remanded on petition; affirmed on cross-petition.