LAGESEN, P. J.
*630 This judicial review proceeding arises from a final order of the Land Use Board of Appeals (LUBA). In that order, LUBA remanded a decision of the Board of Commissioners for Columbia County (the county). The county's decision approved a reasons exception to Statewide Planning Goal 3 (Agricultural Land)-and related comprehensive plan and zoning changes-for an area of agricultural land adjacent to Port Westward, a deepwater port on the Columbia River. The county granted the exception to allow for the expansion of the port. LUBA concluded that the county's findings in support of the exception were inadequate in one respect, but that the decision was otherwise sound. Columbia Riverkeeper (Riverkeeper) petitions for judicial review, contending that LUBA erred by concluding that the county properly determined that two other applicable requirements for the reasons exception were satisfied; the Port of Columbia County (the port) cross-petitions for review, contending that LUBA erred when it determined that some of the county's findings were inadequate. We conclude that neither party has demonstrated that LUBA erred. We therefore affirm on the petition and cross-petition.
I. LEGAL AND FACTUAL BACKGROUND
A. Legal Standards at Issue
We start with the legal standards applicable to the county decision at the heart of this *1186 proceeding. Here, the port seeks authorization for industrial uses on land designated agricultural in the county's comprehensive plan. To obtain that authorization, the port must demonstrate justification for an exception to Statewide Planning Goal 3, which requires counties to preserve and maintain agricultural lands for farm use. One type of allowable exception-the type at issue in this case-is a "reasons exception" under ORS 197.732(2)(c) and OAR 660-004-0020(2). Four standards must be met to permit a reasons exception to a state-wide land use goal:
"(A) Reasons justify why the state policy embodied in the applicable goals should not apply;
*631 "(B) Areas that do not require a new exception cannot reasonably accommodate the use;
"(C) The longterm environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and
"(D) The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."
ORS 197.732(2)(c) ; Statewide Planning Goal 2: Part II (Exceptions); OAR 660-004-0020(2) (restating and amplifying statutory standard).[1]
OAR 660-004-0022 elaborates on the various types of reasons that can justify the conclusion that "the state policy embodied in the applicable goals" should not apply to preclude a particular use. See generally OAR 660-004-0022. Under that rule, one identified reason to allow "siting of industrial development" on resource land outside an urban growth boundary is proximity to a "unique resource," such as-as is the case here-a port: "The use is significantly dependent upon a unique resource located on agricultural or forest land. Examples of such resources and resource sites include *** river or ocean ports[.]" OAR 660-004-0022(3)(a).
B. County Proceedings
This proceeding began in 2013. Port Westward is a deepwater port on the Columbia River. It is a self-scouring site, which means that the property can accommodate deep-draft vessels without being dredged. To lay the groundwork for expanding Port Westward, the port applied to the county for exceptions to Goal 3, along with corresponding amendments to the comprehensive plan and zoning changes, for an 837-acre area of land adjacent to Port Westward. In its application, the port requested that a broad array of *632 industrial uses be allowed on the site, contending that several different exceptions to Goal 3 applied to the property in question. The county approved three exceptions, including a reasons exception, as well as the corresponding plan and zone amendments. However, the matter was appealed to LUBA and LUBA remanded to the county on a number of grounds, including that the county had failed to justify the reasons exception for the wide range of uses proposed.
On remand, the port modified its application. The modified application sought only a reasons exception to permit a limited set of industrial uses on the land. Specifically, the port sought a reasons exception under OAR 660-004-0020(2) and OAR 660-004-0022(3)(a) for five particular uses:
"(1) Forestry and Wood Products processing, production, storage and transportation; (2) Dry Bulk Commodities transfer, storage, production and processing; (3) Liquid Bulk Commodities processing, storage, and transportation; (4) Natural Gas and derivative products, processing, storage, and transportation; and (5) Breakbulk storage, transportation, and processing."
Relying primarily on analysis contained in a report denominated the "Mackenzie Report," the port sought to demonstrate that the reason the policies underlying Goal 3 should not apply to preclude the requested uses is because *1187 those uses are "significantly dependent on [the] unique resource" of a deepwater port. OAR 660-004-0022(3)(a).[2] The Mackenzie Report explained:
"Uses with foreign trade markets and marine-served domestic markets for products that are shipped by marine vessel are, by definition, reliant on deepwater port facilities. Table 2 demonstrates that each of the five proposed uses for [the Port Westward expansion] involve foreign import/export operations and are thus dependent upon a *633 deepwater port. The proposed uses will achieve a significant operational advantage due to deepwater port access with nearby storage yards. As the proposed uses are low-margin businesses, port proximity is necessary to minimize operational costs for both import/export and domestic shipping operations. An external benefit of these firms' locations near port facilities is that locating their yards close to the port minimizes impacts on offsite transportation infrastructure."
Further, the port contended, the other criteria for a reasons exception were met, including the requirement that "[a]reas that do not require a new exception cannot reasonably accommodate the use[s]," OAR 660-004-0020(2)(b), as well as the requirement that the "proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts," OAR 660-004-0020(2)(d).
The county agreed that a reasons exception should be granted for the five proposed uses. The county looked to OAR 660-004-0022(3), as noted, a rule establishing particular exception requirements for the siting of industrial development on rural resource land. The county determined that the deepwater port at Port Westward was the type of "unique resource" that would permit an exception to Goal 3 for uses that are "significantly dependent" on a deepwater port: "[T]he approved uses each involve the act (or acts) of getting the subject goods processed, transferred, imported and/or exported via deepwater port and accordingly serve as a valid basis for taking an exception to Goal 3." However, the county noted that opponents of the exception had legitimate concerns as to whether some of the approved uses when implemented might, in fact, lack the requisite dependence on a deepwater port. To account for those concerns, the county explained that, even though it did not construe the port's application to seek approval for any nondependent uses-it characterized the port's application as "self-limiting"-it would impose measures to safeguard against uses that did not actually depend on a deepwater port:
"To the extent opponents have expressed concern that future rural industrial Port tenant uses could potentially lack a nexus with the deepwater port at Port Westward, *634 and thereby undermine the basis for granting the exception, the Board finds that the terms of the Port's application on remand is self-limiting in that the sole basis the Port has put forward is significant dependence on the deepwater port at Port Westward. Given that limitation, any potential tenant seeking to locate in the new expansion area would be limited not only to the five authorized uses, but to the five authorized uses in a form that would be significantly dependent on the deepwater port at Port Westward.
"Nevertheless, the Board acknowledges that the opponents' concern is a reasonable one and notes that Condition 5 has accordingly been imposed for additional clarity. The condition requires that the five uses authorized be significantly dependent on and have demonstrated access to the deepwater port at Port Westward. With that condition in place, the Board finds that the only rural industrial uses the approval authorizes in the new expansion area are those that will be significantly dependent *1188 on actual deepwater port usage at Port Westward."
Addressing the requirements of OAR 660-004-0020(2)(b), the county determined that the proposed uses could not be "reasonably accommodated" instead by "areas that do not require a new exception." It concluded that the relevant areas to consider for purpose of its analysis were the five other deepwater ports in Oregon, rejecting arguments that it must look to out-of-state sites, or to ports that were not deepwater ports. The county then found that the Port of Portland and the Port of Astoria were not viable alternative sites to accommodate the proposed uses because of space limitations and other constraints. It determined that the other three deepwater ports in Oregon-the Port of Coos Bay, the Port of Newport, and the Port of Tillamook-were not viable alternative sites that could reasonably accommodate the same uses because those sites were located too far from the Columbia River/M-84 marine highway corridor commerce. Addressing the Port of Coos Bay, the county explained:
"The Board finds that the Oregon International Port of Coos Bay is not a viable alternative. The Mackenzie Report explains that Coos Bay serves a completely different economic area because it is 200 nautical miles from the mouth of the Columbia River and does not serve Columbia *635 River/M-84 corridor commerce, and because it is 230 road miles from the Portland metropolitan area. The Mackenzie Report also notes that over 60% of Oregon's manufacturing, warehousing, and transportation-based economy is located along the Columbia River Corridor. For commerce beyond Oregon, the confluence of national or regional waterways (Columbia River/M-84), freeways (I-5, I-84), and rail net-works (Union Pacific and BNSF Class I rail lines) occurs at the metro area only 50 miles from Port Westward, but 230 road miles from Coos Bay. Based on that, the Mackenzie Report concludes that properties in Coos Bay are not economically comparable to Port Westward to serve the Columbia River Corridor economy. Accordingly, [the] Board concludes that the Oregon International Port of Coos Bay is not a viable alternative for the approved uses."
The county explained that, because of similar reasoning based on location, the Port of Newport and the Port of Tillamook also were not sites that could reasonably accommodate the proposed uses. The Port of Tillamook, the county added, was not suitable for an additional reason: it "entirely lacks maritime access."
Addressing the requirements of OAR 660-004-0020(2)(d), the county determined that the "proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts." It found that the approval contained numerous conditions that could mitigate any adverse impacts from the proposed uses. Addressing the opponents' argument that the proposed uses were too poorly defined to conduct a meaningful compatibility analysis, the county found that there was no evidence that the proposed uses would impact adjacent uses differently from the industrial uses currently permitted at Port Westward:
"Opponents have argued that the approved uses are so broad as to prohibit maintaining such compatibility, but have not explained how compatibility is not adequately maintained between one or more of those approved uses. The Board notes that under ORS 197.732(1)(a) and OAR 660-004-0020(2)(d) 'compatible' as a term 'is not intended as an absolute term meaning no interference or adverse impacts of any type with adjacent uses.' The Board finds no evidence in the record of any meaningful distinction *636 between the anticipated impacts of the approved uses and those of existing industrial uses at Port Westward on neighboring uses and therefore finds that the approved uses will be similarly compatible with existing adjacent uses."
Thereafter, the county adopted Ordinance No. 2018-1 granting the port's application with conditions.
C. LUBA Proceedings
Riverkeeper appealed to LUBA, as did *1189 1000 Friends of Oregon.[3] Pertinent to this proceeding, Riverkeeper contended that, for numerous reasons, the county erred in concluding that (1) the five proposed uses were "significantly dependent" on the "unique resource" of a deepwater port; (2) other sites that did not require an exception could not reasonably accommodate the five proposed uses; and (3) the proposed uses were compatible with adjacent uses, or could be made compatible with measures designed to address the impacts of the uses. Riverkeeper contended that, in reaching those conclusions, the county erroneously interpreted the applicable rules, and also that its determinations were not supported by substantial evidence.
LUBA rejected Riverkeeper's first two assertions but agreed with the third. Regarding Riverkeeper's challenges to the board's "significantly dependent" determination, LUBA rejected the argument that, because certain components of the five uses might not, on their own, be significantly dependent on a deepwater port, that meant that the fives uses as a whole were not significantly dependent. In particular, LUBA pointed to the analysis in the Mackenzie Report explaining how the five uses, including their components, were "highly dependent" on proximity to a deepwater port because of the low-margin operations involved:
"The port argues, and we agree, that petitioners have not demonstrated that the county erred in concluding that the five identified uses are 'significantly dependent' on the deepwater port, notwithstanding that some components of the uses could theoretically be separated from the others *637 and located elsewhere. As the Mackenzie Report notes, import/export uses of this kind are low-margin operations, and proximity to a deepwater port represents a significant operational and cost advantage. That advantage clearly extends to the import/export operation as a whole. Stated differently, an otherwise integrated import/export operation that is allowed to locate only storage yards and loading/unloading facilities at the port, but is forced to locate processing and other components of the operation elsewhere, could be at a significant economic disadvantage *** that may preclude siting any facilities entirely at Port Westward. We conclude that the county did not err in evaluating the five identified uses as a whole, including components such as processing or production of goods and commodities transshipped via the port, to determine whether the use as a whole is significantly dependent on the deepwater port."
LUBA also rejected the contention that the board's inclusion of Condition 5 (requiring a demonstration that any use allowed in the exception area is, in fact, significantly dependent on the deepwater port) meant that the county was, in effect, impermissibly deferring its finding regarding significant dependence until a later date. LUBA elaborated:
"However, we disagree that Condition 5 represents a deferral of findings of compliance with OAR 660-004-0022(3)(a). The county adopted several pages of findings intended to establish that uses authorized under the exception are limited to those that are significantly dependent on the port facility. Record 18-21. The county imposed Condition 5 only because opponents, including petitioners, expressed concerns that there were inadequate safeguards to prevent approval of industrial uses that are not in fact significantly dependent on the port facility. That the county agreed to impose additional safeguards does not mean that the county deferred findings of compliance with OAR 660-004-0022(3)(a) to the permit stage."
Addressing whether there were other sites not requiring an exception that could reasonably accommodate the five proposed uses, LUBA first rejected Riverkeeper's argument that the county erred by limiting its consideration to the other deepwater port sites in Oregon. LUBA explained that, "because the exception is justified based *638 solely on the 'unique resource' of a deepwater port-in *1190 this case, a self-scouring deepwater port that requires no dredging in order to accommodate ocean-going cargo vessels-the county properly limited its analysis to alternative sites with access to a deepwater port."
LUBA next addressed Riverkeeper's contention that the county erred when it concluded that the three coastal ports could not reasonably accommodate the uses proposed for the expansion area because of their location outside the Columbia River corridor; Riverkeeper argued that it "is error under OAR 660-004-0022(3)(a) to reject an alternative site simply because it does not serve the same economic region as the preferred site." Rejecting that argument, LUBA explained that, under OAR 660-004-0020(2)(b), the county was permitted to consider economic factors in determining whether other sites could reasonably accommodate the proposed uses and, further, that
"[p]art of what makes the Port Westward site a unique resource is its status as one of three deepwater ports along a primary maritime artery, connecting national and international markets within the Portland Metropolitan area, the state's largest economic area. The three coastal ports are located hundreds of miles away from that economic area and serve very different and more isolated regional markets. We conclude that in conducting an alternative site analysis for industrial uses justified based on proximity to the 'unique resource' of a river or ocean port under OAR 660-004-0022(3)(a), the county is not required to evaluate other port sites in the state (or elsewhere) that serve entirely different economic markets."
LUBA did not, however, accept the county's decision in every respect. It determined that the county's analysis regarding the compatibility between the proposed uses and adjacent uses was not supported by adequate findings or substantial evidence. Observing that the county inferred that the impacts of the proposed uses would not adversely affect adjacent uses based on the types of impacts from past industrial uses, LUBA explained that the inference was not reasonable absent evidence that the impacts of the proposed uses would be comparable to the impacts of existing uses:
*639 "[T]he Port does not cite to any evidence supporting the county's finding that the likely adverse impacts of the proposed uses are similar to the impacts of the existing industrial uses at Port Westward. The findings simply state that there is no evidence that the impacts would be different. However, the absence of evidence that the impacts would be different is not a basis to conclude that the impacts would be similar. The unsupported presumption that the impacts would be similar is the foundation for much of the county's subsequent analysis. Because that presumption is not supported by substantial evidence, we agree with petitioners that remand is necessary to adopt more adequate findings regarding compatibility, supported by substantial evidence."
(Emphasis in original.)
Board member Zamudio concurred in the decision "based on the facts that the exception is based on a single unique resource, the river port, the exception authorizes only those uses that are significantly dependent on the river port, and the exception area is uniquely situated by the river port." She wrote separately to address several of her concerns with the county's decision.
D. Issues and Arguments on Judicial Review
As noted, Riverkeeper has petitioned for judicial review of LUBA's final order, and the port has cross-petitioned. Riverkeeper assigns error to LUBA's determinations that (1) the county correctly determined that the five proposed uses are significantly dependent on the unique resources of a deepwater port and (2) the county correctly concluded that there were no other sites that could, without an exception, reasonably accommodate the proposed uses. The port assigns error to LUBA's conclusion that the county's determination regarding the compatibility of the proposed uses with adjacent uses was not supported by adequate findings or substantial evidence.
*1191 II. STANDARD OF REVIEW
In the order on review, LUBA did not engage in any factfinding under ORS 197.835(2), and, before us, neither party contends that LUBA's order is unconstitutional. We therefore review LUBA's order to determine whether it is *640 "unlawful in substance or procedure." ORS 197.850(9)(a) ; Central Oregon Landwatch v. Deschutes County , 285 Or. App. 267, 269, 396 P.3d 968 (2017). To the extent that the parties' assignments of error challenge LUBA's determinations as to whether substantial evidence supports the county's order, we review to assess whether LUBA correctly understood its role in conducting its review for substantial evidence. Root v. Klamath County , 260 Or. App. 665, 670, 320 P.3d 631 (2014).
III. ANALYSIS
A. Riverkeeper's Petition
1. Significant dependence
In its first assignment of error, Riverkeeper argues that LUBA erred in upholding the county's determination that the five proposed uses identified in the port's application are significantly dependent on the unique resource of a deepwater port. Specifically, Riverkeeper contends that LUBA erred in three different ways: (1) by misconstruing its arguments; (2) by misconstruing the "significant dependence" standard articulated in OAR 660-004-0022(3)(a) ; and (3) by rejecting the argument that the county impermissibly deferred a finding of significant dependence until a later time. The central thesis of Riverkeeper's arguments is that the approved uses are broad and contain subcategories of uses that, in and of themselves, could not be found (on this record, anyway) to be significantly dependent on a deepwater port. In Riverkeeper's view, OAR 660-004-0022(3)(a) required the county to separately analyze those subcategories of uses to determine whether they were significantly dependent on a deepwater port; further, the fact that the record would not support the conclusion that those subcategories are significantly dependent on a deepwater port means that the county erred in approving the application. Riverkeeper also contends that the county's imposition of Condition 5, requiring that the five uses allowed, in fact, be significantly dependent on a deepwater port, demonstrates that the county impermissibly deferred making a "significant dependence" determination.
Riverkeeper's arguments do not demonstrate that LUBA's order is "unlawful in substance." As to Riverkeeper's first point, having reviewed the record, we are not convinced *641 that LUBA misunderstood the arguments that Riverkeeper presented to it. As for Riverkeeper's remaining arguments, they appear to rest on a characterization of the county's decision that LUBA was not required to accept, given the plain terms of the decision. Riverkeeper's arguments appear to rest on the proposition that the county's exception allows for the five proposed uses in the broadest of terms. If that were the case, then Riverkeeper might be right that the county's "significant dependence" determination could not be sustained on this record. But, the county's decision, as LUBA recognized, is not so broad.
Specifically, the county construed the port's application to be "self-limiting," that is, to seek approval only for those uses that were in fact dependent on a deepwater port. With the application so construed, the county then found that the evidence demonstrated that those uses were dependent on a deepwater port based on the analysis in the Mackenzie Report explaining how the five proposed uses involved "low-margin" import and export operations that were "highly dependent" on access to a deepwater port. The county evaluated each of the five approved uses "as a whole" in determining significant dependence on a deepwater port, that is, the county interpreted the allowed use categories to require each use to be dependent upon port transportation services.
Finally, the county adopted an exception statement in its comprehensive plan that limited the allowed uses in the exception area to the five categories of uses that are significantly dependent on the deepwater port at Port Westward. The exception statement determined that "each of the five proposed uses for [Port Westward] involve foreign import/export operations and are thus dependent *1192 upon a deepwater port." In addition, to ensure that any uses eventually allowed would comport with the county's narrow construction of the port's application (and the evidence that supported the approval of the application, as narrowly construed), the county imposed Condition 5.
When the county's decision is understood in that manner, Riverkeeper's arguments do not demonstrate any error in LUBA's rejection of Riverkeeper's arguments *642 regarding the county's interpretation and application of OAR 660-004-0022(3)(b). Under OAR 660-004-0018(4)(a), when a local government takes a reasons exception, "plan and zone designations must limit the uses, density, public facilities and services, and activities to only those that are justified in the exception." ORS 197.732(1)(b) and the equivalent part of Statewide Planning Goal 2: Part II define an "exception" as "a comprehensive plan provision" that applies to specific properties and avoids a goal requirement by meeting the standards for taking an exception. See Waste Not of Yamhill County v. Yamhill County , 240 Or. App. 285, 288, 246 P.3d 493 (2010) ("When a city or county wishes to adopt a property-specific plan provision that is inconsistent with a goal requirement, it approves an exception to that goal requirement as part of the comprehensive plan.").
That is precisely what the county did in adopting an exceptions statement that approved the five categories of rural industrial uses-each of which has a storage and transportation component-while limiting those uses to ones that are "substantially dependent on a deepwater port and have demonstrated access rights to the dock." The exceptions statement requires that any allowed use be integrated with the port operations through demonstrated access rights for the required storage and transportation components of the use and that the use be "substantially dependent" on Port Westward. That is sufficient to comply with the demands of OAR 660-004-0018(4)(a) and to rebut Riverkeeper's contention that the use allowances were too broad or insufficient in form.
2. Alternative sites analysis
Riverkeeper next challenges LUBA's determination that the county correctly determined that there was no alternative site that could accommodate the proposed uses without a goal exception, OAR 660-004-0020(2)(b). As we understand Riverkeeper's argument, it contends that the county excluded from consideration other coastal ports that did not serve the Columbia River corridor, and yet the county never adequately explained why proximity to the Columbia River corridor was relevant to the inquiry of whether other sites could reasonably accommodate the *643 proposed uses. Riverkeeper further contends that LUBA's decision upholding the county's determination that it need not take into account the ocean ports is inconsistent with OAR 660-004-0020(2)(b) because, in its view, "[n]othing in the text of [the rule] limits the 'reasonable accommodation' analysis to sites located within the same geographic area or economic market." Riverkeeper asserts that LUBA impermissibly relied on findings and conclusions not contained in the county's decision when it addressed the fact that it is permissible under the rule to rely on economic factors when evaluating the viability of a proposed alternative site.
Riverkeeper's contentions do not convince us that LUBA's decision is "unlawful in substance" in upholding the county's determination regarding coastal ports. First, contrary to Riverkeeper's arguments, the terms of OAR 660-004-0020(2)(a) and (b) indicate that a local government may limit its consideration of alternative sites to ones that are near the proposed exception area. That provision states, in full:
"(2) The four standards in Goal 2 Part II(c) required to be addressed when taking an exception to a goal are described in subsections (a) through (d) of this section, including general requirements applicable to each of the factors:
"(a) 'Reasons justify why the state policy embodied in the applicable goals should not apply.' The exception shall set forth the facts and assumptions used as the basis for determining that a state policy embodied in a goal should not apply to specific properties or situations, including the *1193 amount of land for the use being planned and why the use requires a location on resource land;
"(b) 'Areas that do not require a new exception cannot reasonably accommodate the use.' The exception must meet the following requirements:
"(A) The exception shall indicate on a map or otherwise describe the location of possible alternative areas considered for the use that do not require a new exception. The area for which the exception is taken shall be identified;
"(B) To show why the particular site is justified, it is necessary to discuss why other areas that do not require a new exception cannot reasonably accommodate the proposed *644 use. Economic factors may be considered along with other relevant factors in determining that the use cannot reasonably be accommodated in other areas. Under this test the following questions shall be addressed:
"(i) Can the proposed use be reasonably accommodated on nonresource land that would not require an exception, including increasing the density of uses on nonresource land? If not, why not?
"(ii) Can the proposed use be reasonably accommodated on resource land that is already irrevocably committed to nonresource uses not allowed by the applicable Goal, including resource land in existing unincorporated communities, or by increasing the density of uses on committed lands? If not, why not?
"(iii) Can the proposed use be reasonably accommodated inside an urban growth boundary? If not, why not?
"(iv) Can the proposed use be reasonably accommodated without the provision of a proposed public facility or service? If not, why not?
"(C) The 'alternative areas' standard in paragraph B may be met by a broad review of similar types of areas rather than a review of specific alternative sites. Initially, a local government adopting an exception need assess only whether those similar types of areas in the vicinity could not reasonably accommodate the proposed use. Site specific comparisons are not required of a local government taking an exception unless another party to the local proceeding describes specific sites that can more reasonably accommodate the proposed use. A detailed evaluation of specific alternative sites is thus not required unless such sites are specifically described, with facts to support the assertion that the sites are more reasonable, by another party during the local exceptions proceeding."
OAR 660-004-0020(2)(a), (b) (emphasis added).[4]
*645 The italicized wording in OAR 660-004-0020 (2)(a) and (b) explains that a local government need initially examine generally whether "similar types of areas in the vicinity" could reasonably accommodate the proposed use or uses, and need not examine specific locations. The use of the word "vicinity" suggests that a local government may, consistent with the rule, limit its consideration of alternative sites to those that are near the proposed exceptions area. The common meaning of "vicinity" in this context is "[t]he quality or state of being near: NEARNESS , PROPINQUITY , PROXIMITY " or, along the same lines, "[a] surrounding area or district: LOCALITY , NEIGHBORHOOD ." Webster's Third New Int'l Dictionary 2550 (unabridged ed. 2002). Although the rule specifies that a local government must conduct a "site specific comparison" if a party to the proceeding suggests a specific site for consideration, the terms of the rule do not compel the conclusion that that obligation extends to consideration of specific sites outside of the "vicinity" of the proposed exceptions.
*1194 In any event, even if a party's proposal of a specific site can operate to require consideration of sites outside the "vicinity" of a proposed exception area, a local government's obligation to conduct a site-specific comparison between the proposed exceptions area and another site proposed by a party to the proceeding arises only when another party to the proceeding "describes specific sites that can more reasonably accommodate the proposed use." OAR 660-004-0020 (2)(b)(C) (emphasis added). The rule specifies further that the local government may take into account "economic factors" in evaluating whether alternative sites are ones that could reasonably accommodate a particular use. OAR 660-004-0020(2)(b). Here, the county found, based on the analysis in the Mackenzie Report, that the coastal ports were not "economically comparable" to Port Westward, given their distance from the Columbia River Corridor market that Port Westward serves and, based on that finding, did not conduct further analysis regarding the coastal ports' ability to accommodate the uses proposed for the requested exception area.[5]
*646 Riverkeeper has not persuaded us that that analysis contravenes the requirements of OAR 660-004-0020(2)(b). Essentially, assuming that the county was obliged to consider the ocean ports although they are outside the "vicinity" of Port Westward, the county's finding that the coastal ports were not "economically comparable" to Port Westward effectively foreclosed on this record a conclusion that those proposed alternative sites are ones that "can more reasonably accommodate" the proposed uses. For that reason, the county's decision not to engage in further analysis of those sites' capacity to accommodate the proposed uses was not inconsistent with the requirements of the rule. Therefore, we reject Riverkeeper's contention that LUBA's decision to uphold the county's alternative sites analysis is "unlawful in substance."
B. The Port's Cross-Petition
In its cross-petition, the port assigns error to LUBA's conclusion that the county's determination that the proposed uses are "compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts" was not supported by adequate findings. The port contends that LUBA misinterpreted the county's findings on the point and, based on that misinterpretation, erroneously concluded that the county's findings were not adequate to support its conclusion regarding the compatibility of the proposed uses with adjacent uses.
We are not convinced. We understand LUBA's rejection of the county's compatibility determination to turn on an application of the substantial evidence standard of review. LUBA, in essence, determined that the county's compatibility determination was not supported by substantial evidence because it turned, by it terms, on a finding that there is "no evidence" that the impacts of the proposed uses would be different from the impacts of the existing uses: "The Board finds no evidence in the record of any meaningful distinction between the anticipated impacts of the approved uses and *647 those existing industrial uses at Port Westward on neighboring uses, and therefore finds that the approved uses will be similarly compatible with existing adjacent uses." But, as LUBA correctly recognized, an absence of evidence about the differences between impacts from current and proposed uses is not, by itself, a basis on which to logically infer that the impacts are the same.
As noted above, our task in evaluating LUBA's application of the substantial evidence standard of review is to determine whether LUBA correctly understood its role in applying that standard. Root , 260 Or. App. at 670, 320 P.3d 631. We may not displace its decision unless "there is no evidence to support the finding or if the evidence in the case *1195 is 'so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review.' " Citizens for Responsibility v. Lane County , 218 Or. App. 339, 345, 180 P.3d 35 (2008) (quoting Younger v. City of Portland , 305 Or. 346, 359, 752 P.2d 262 (1988) ). Although the port correctly points out that the county's compatibility determination was based on more expansive findings than that on which LUBA focused, the county nonetheless expressly tethered its compatibility determination to its factual finding that there was "no evidence" that impacts of the proposed uses would be different from those of the existing uses. Under those circumstances, LUBA's decision to remand does not reflect a misunderstanding of its role on substantial evidence review, or otherwise demonstrate legal error.
IV. CONCLUSION
For the foregoing reasons, the parties have not convinced us that LUBA erred in any respect.
Affirmed on petition and cross-petition.

For each of the four criteria listed in OAR 197.732(2)(c), OAR 660-004-0020(2) describes in greater detail the analysis a local government must undertake in determining whether the criteria are met.

OAR 660-004-0022(3) provides, in relevant part:
"Rural Industrial Development: For the siting of industrial development on resource land outside an urban growth boundary, appropriate reasons and facts may include, but are not limited to, the following:
"(a) The use is significantly dependent upon a unique resource located on agricultural or forest land. Examples of such resources and resource sites include geothermal wells, mineral or aggregate deposits, water reservoirs, natural features, or river or ocean ports."

1000 Friends of Oregon is not a party to this judicial review proceeding. Before LUBA, the arguments of Riverkeeper and 1000 Friends had significant overlap. References to arguments made by Riverkeeper below at times encompass overlapping arguments by 1000 Friends.

We note that the exception statement is part of a "comprehensive plan," defined by ORS 197.015(5) to be "a generalized, coordinated land use map and policy statement *** that interrelates all functional and natural systems and activities relating to the use of lands ***. *** 'Comprehensive' means all-inclusive, both in terms of the geographic area covered and functional and natural activities and systems occurring in the area covered by the plan." We need not decide whether the alternative lands evaluated in a plan's exception statement are necessarily confined to the same geographic area as the plan so as to qualify the plan as "comprehensive" and its provisions as interrelated.

Under OAR 660-004-0020(2)(a) and (b), alternative lands are those that can "reasonably accommodate the proposed use." The "proposed use" is the use specified in the reasons exception, and the suitability of land as an alternative depends upon whether it can satisfy that specified land use need. Where the need is for port-related land on the Columbia River, as may be the case here, the evaluated alternative lands would seem to be confined to those proximate to a port on the river that could "reasonably accommodate the proposed use."